S13A0201, S13X0202. HUMPHREY v. NANCE; and vice versa.
(744 SE2d 706)

HUNSTEIN, Chief Justice.

In 1997, Michael W. Nance was convicted of malice murder, felony murder, aggravated assault, theft by taking, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony, and he was sentenced to death for the malice murder. This Court affirmed Nance's convictions but reversed his death sentence and remanded the case for resentencing because a prospective juror was improperly qualified to serve on the jury. See *Nance v. State*, 272 Ga. 217 (526 SE2d 560) (2000) (unanimously affirming the convictions and reversing the death sentence with Carley and Hines, JJ., concurring specially as to one guilt/innocence phase issue). In 2002, Nance was sentenced to death a second time, and on the second appeal this Court unanimously affirmed his death sentence for the malice murder conviction. See *Nance v. State*, 280 Ga. 125 (623 SE2d 470) (2005). In 2007, Nance filed a petition for a writ of habeas corpus, which he amended on January 17, 2008. An evidentiary hearing was held on August 19-21, 2008, and, in an order filed on September 6, 2012, the habeas court denied relief with respect to Nance's convictions, but vacated Nance's death sentence based upon its finding that his trial counsel had been prejudicially

deficient in presenting mitigating evidence at his resentencing trial. The Warden appeals the habeas court's vacation of the death sentence in case number S13A0201, and Nance cross-appeals in case number S13X0202, claiming that the habeas court should have also granted relief regarding his malice murder conviction. In the Warden's appeal, this Court reverses and reinstates Nance's death sentence. In Nance's cross-appeal, this Court affirms.

## I. *Factual Background*

The evidence presented at the guilt/innocence phase of the 1997 trial showed the following. Nance stole a 1980 Oldsmobile Omega and drove to a bank in Gwinnett County on December 18, 1993. After entering the bank at approximately 11:00 a.m., Nance pulled a ski mask over his face, waved a .22 caliber revolver, and demanded that the tellers place cash in two pillowcases that he was carrying. Nance made several threats to the tellers, including threatening to kill them if they used dye packs. The tellers nevertheless slipped two dye packs into the pillowcases with the money. Nance exited the bank and got into the Omega where the dye packs detonated, emitting red dye and tear gas. Grabbing a black trash bag containing the gun, Nance abandoned the Omega and went across the street to a liquor store parking lot where Gabor Balogh was backing his car out of a parking space. Dan McNeal, who had just left the liquor store behind Balogh, was standing nearby. He saw Nance run around the front of Balogh's car, yank open the driver's door, and thrust his right arm with the plastic bag into Balogh's car. Then McNeal heard arguing and Balogh saying, "no, no, no," as he leaned away from Nance and raised his left arm defensively. Nance shot Balogh in the left elbow, and the bullet entered his chest and caused his death a short time later. Nance then pointed the gun at McNeal and demanded his keys. Instead of complying, McNeal ran around the side of the liquor store. Nance fired another shot, but McNeal was not hit. Nance then ran around the opposite side of the liquor store, confronted McNeal behind the store, and pointed the gun at him. As McNeal ran back to the front of the store, Nance turned and ran to a nearby Chevron station, where he entered into a standoff with police, telling them, "If anyone rushes me, there's going to be war." Over an hour passed before police persuaded Nance to surrender. The State also presented evidence that Nance had robbed another Gwinnett County bank three months earlier where he had made a similar threat to kill the teller and that he had pleaded guilty in federal court to committing both Gwinnett County bank robberies.

## II. *Ineffective Assistance of Counsel Claim at the 2002 Resentencing Trial*

In case number S13A0201, the Warden appeals the habeas court's determination that trial counsel were ineffective at Nance's resentencing trial in 2002 for failing to adequately present mitigating evidence regarding Nance's borderline intellectual functioning, organic brain damage, and exposure to tear gas.

### A. *Applicable Law*

To prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was not reasonable under the circumstances and that actual prejudice resulted. See *Strickland v. Washington*, 466 U. S. 668, 691 (104 SCt 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). Under the rules and presumptions set down in *Strickland*,

> "(j)udicial scrutiny of counsel's performance must be highly deferential[.]" . . . [A]ny ineffective assistance inquiry [must begin] with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." . . . Because constitutionally acceptable performance is not narrowly defined, but instead encompasses a "wide range," a petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden.

(Citations omitted.) *Waters v. Thomas*, 46 F3d 1506, 1511-1512 (11th Cir. 1995). To show sufficient prejudice to prevail on his claim, a petitioner must show that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citation omitted.) *Smith*, 253 Ga. at 783 (1). In reviewing a habeas court's ruling on an ineffective assistance claim, "[w]e accept the habeas court's findings of fact unless clearly erroneous and independently apply the law to those facts." *Head v. Hill*, 277 Ga. 255, 266 (VI) (587 SE2d 613) (2003).

(1) The Warden contends that the habeas court erred as a matter of law by applying the principle enunciated in its order that "[c]ompetent defense counsel presents the jury with the *totality* of reasonably available mitigation evidence, consistent with the defense strategy," in determining that Nance's trial counsel were constitutionally deficient at his resentencing trial in omitting the mitigating evidence presented in his habeas proceeding. (Emphasis supplied.) We agree

that the principle articulated by the habeas court is contrary to the law. In *Strickland,* the United States Supreme Court noted that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U. S. at 689. Accordingly, the Supreme Court eschewed "rigid requirements for acceptable assistance," like the requirement that the habeas court here erroneously applied. Id. at 690. Trial counsel are not constitutionally deficient as a matter of law simply because they do not present all reasonably available mitigating evidence, even if the omitted evidence is consistent with their chosen strategy. See *Hall v. Lee,* 286 Ga. 79, 80-81 (II) (B) (1) (684 SE2d 868) (2009); *Chandler v. United States,* 218 F3d 1305, 1319 (XI) (11th Cir. 2000). Rather, in reviewing trial counsel's performance, " '[w]e ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.' " (Citation omitted.) *Jefferson v. Zant,* 263 Ga. 316, 318 (3) (a) (431 SE2d 110) (1993).

(2) Critical to the question of whether a reasonable lawyer could have decided to forego presenting readily available mitigating evidence is the thoroughness of the investigation supporting that decision. See *Wiggins v. Smith,* 539 U. S. 510, 522 (123 SCt 2527, 156 LE2d 471) (2003) (stating that the Court's "principal concern" in deciding whether counsel exercised reasonable professional judgment was not whether counsel should have presented a mitigation case but whether the investigation supporting the decision not to do so was reasonable). In that regard, the Warden contends that the habeas court also failed to give proper deference to its own finding, amply supported in the record, that trial counsel made a reasonable investigation before deciding what evidence to present and, conversely, what evidence to omit at Nance's resentencing trial. After an independent review of the record, we agree with the Warden's argument for the reasons discussed below.

### B. *The 1997 Original Trial*

Even though the Warden challenges the habeas court's ruling that Nance's trial counsel were ineffective in his *resentencing trial,* trial counsel's investigation and presentation of evidence in his *original trial* are relevant because trial counsel's actions and what occurred in the original trial reasonably affected their investigation and presentation of mitigating evidence in the resentencing trial.

Thus, we begin with a review of the original trial in 1997.[1]

(1) *Investigation for the 1997 Trial*

Nance was originally represented by lead counsel Donald Hudson and co-counsel Edwin Wilson. Before Nance was tried in Gwinnett County, he pled guilty in federal court to both of the Gwinnett County bank robberies and to possession of a firearm by a convicted felon. Nance was represented in his federal case by counsel from the Federal Public Defender Program. After Nance was sentenced in federal court, the Gwinnett County trial court granted Hudson's request to be dismissed as Nance's attorney for reasons not directly related to Nance's case. The court appointed Johnny Moore, a former Gwinnett County chief assistant district attorney, to replace Hudson as lead counsel. Moore informed the court at his appointment that he had been "involved in death penalty cases for about 24 years." Wilson was also a former prosecutor, had been practicing criminal law for approximately 20 years, and had experience in death penalty litigation.

The record shows that Nance's federal defense team completed a significant amount of investigation of the case, including an investigation into Nance's mental health and social history for the purpose of developing mitigating evidence. Trial counsel testified that they received what they believed to be the entire file from the Federal Public Defender Program at the conclusion of Nance's federal case and that they used the material from the file as "a starting point" to conduct their own investigation. The record supports the habeas court's findings that counsel used multiple investigators and mitigation specialists in investigating and preparing Nance's case for the original trial and that counsel consulted with Michael Mears and Pamela Leonard, the director and the senior mitigation specialist, respectively, of the Multi-County Public Defender's Office regarding Nance's case. Prior to the original trial, Moore and an investigator traveled to Nance's home state of Kansas to interview his family members and develop mitigating social history evidence. Among other things, trial counsel also obtained records relevant to the case and Nance's history, examined the State's discovery, met with the district attorney in an attempt to obtain a plea offer for Nance to plead

---

[1] The review of the evidence presented in the original trial will also be relevant below in our discussion of Nance's cross-appeal, which concerns trial counsel's presentation at the guilt/innocence phase of the original trial.

guilty in exchange for a life without parole sentence,[2] inspected the physical evidence in the case and the crime scene, viewed the videotapes of the bank robbery and the standoff, and interviewed the State's experts and thus were prepared to elicit favorable testimony on cross-examination.

The attorneys testified that Wilson was in charge of the guilt/innocence phase, that Moore handled the sentencing phase and expert testimony, and that they worked well together. They also testified that the charges against Nance were "basically indefensible," as there was never any question as to his guilt, and that their guilt/innocence phase strategy was to present evidence that Nance never intended to murder the victim. As a part of that strategy, trial counsel attempted to show that the effects of the dye packs' detonation caused Nance to be confused and disoriented at the time that he abandoned the Omega, went across the street, and shot the victim. Trial counsel testified that they realized such evidence would not disprove Nance's criminal intent to shoot the victim but that they hoped that the jury would consider the evidence mitigating in the sentencing phase.

Regarding any mental health defenses, trial counsel had in their possession the reports of Drs. Barry Scanlon and Robert Shaffer, who had been retained in 1994 to conduct mental health evaluations of Nance as part of his federal case. After conducting a psychological evaluation of Nance, Dr. Shaffer had diagnosed Nance with cognitive disorder not otherwise specified, possible pervasive developmental disorder, polysubstance dependence, borderline intellectual functioning, and mixed personality disorder with schizoid or autistic features. Dr. Scanlon had conducted a forensic psychiatric evaluation of Nance, and he had concluded that diagnoses of pervasive developmental disorder, cognitive disorder not otherwise specified, and cocaine, alcohol, and polysubstance dependence "appear[ed] applicable" to Nance. After consulting with both experts, trial counsel retained Dr. Shaffer in July 1997 to assist in the original trial, specifically requesting that he conduct additional testing of Nance and "look for anything that might be mitigating even if [it were] not a defense to the crime."

The record supports the habeas court's findings that, in pursuing an investigation into the dye packs so as to obtain evidence to support their theory for the original trial, trial counsel took the following actions: obtained funds from the trial court to retain an expert in this area; obtained the curriculum vitae of several experts and spoke with

---

[2] Nance had already received a sentence of life without parole in his federal case. See *Nance v. State*, 266 Ga. 816, 816, n. 1 (471 SE2d 216) (1996).

at least four individuals who had expertise in dye packs, including a representative from the dye packs' manufacturer; successfully subpoenaed the material safety data sheet from the manufacturer, which listed the main ingredients contained in the dye packs as being red dye, o-chlorobenzylidene malononitrile ("CS tear gas"), and potassium chlorate and which described the potential effects of those ingredients; retained a toxicologist to review the toxicity information on CS tear gas, review the facts of the case, and perform a calculation of the CS tear gas concentration in the Omega's passenger compartment; spoke with the medical examiner, Dr. Joseph Burton, to obtain his opinion regarding the potential effects of the CS tear gas; and interviewed Larry Peterson, the microanalyst from the Georgia Bureau of Investigation Crime Lab who examined and tested Nance's items of clothing for the presence of red dye from the dye packs. The record also supports the habeas court's finding that trial counsel reviewed the information that they had obtained regarding the dye packs and had a number of conversations regarding their investigation. Based on the foregoing, we find that the habeas court did not err in concluding that "trial counsel's approach to investigation and preparation for the guilt-innocence phase of the original trial was reasonable when properly evaluated using the *Strickland* standards."

### (2) *Presentation at the Guilt/Innocence Phase of the 1997 Trial*

Consistent with trial counsel's guilt/innocence phase theory, Wilson told the jury in opening statements at the original trial that the evidence would show that the dye packs' sudden detonation caused Nance to panic and become confused, that he fled across the street where "the pistol went off" when he encountered an "intoxicated [Balogh]" whom he perceived to be attempting to run over him, that he never fired at McNeal but only shot into the air "at some point," and that he was remorseful. Wilson concluded that Nance "never intended to shoot anyone" and "certainly never intended to kill anyone."

During the presentation of the State's case, trial counsel elicited through cross-examination of bank tellers and law enforcement officers the following testimony regarding the dye packs and the possible effects of their detonation: *two* dye packs were placed in the pillowcases; the dye packs contained dye and CS tear gas; Nance was in the vehicle when red smoke billowed from it, arguably showing that he had at least some exposure to CS tear gas; and exposure to CS tear gas causes burning eyes and stinging skin.

On direct examination, Dr. Burton, who was qualified as an expert in the field of forensic pathology, testified that he "ha[d] some training and some expertise in what . . . tear gas is and what [its] effects [on human beings] are" and that he was specifically familiar with CS tear gas. He also testified that exposure to CS tear gas irritated the mucus membranes and caused immediate tearing of the eyes and involuntary shutting of the eyelids; coughing and irritation of the throat, trachea, airway, and lungs if inhaled; and possible tightness of the chest or a possible asthma attack. When asked on direct examination for his opinion as to whether Nance was significantly exposed to the CS tear gas, Dr. Burton first noted that Nance was able to exit his car, "cross[ ] a parking lot," approach a vehicle, make a specific request of the driver, turn to face a second person, make a specific request of him, and then run around a building, "which would require that [he] have at least probably some visual contact with the environment and make a deliberate act to move in a particular direction." Dr. Burton concluded that the described actions demonstrated that Nance was not visually impaired or significantly disoriented and, thus, that there was "no evidence that the expected reaction to exposure with CS spray was apparent in [Nance]." During cross-examination, Moore elicited Dr. Burton's testimony clarifying that he had not opined on direct examination that Nance "didn't possibly have some exposure" to the CS tear gas but that, instead, "there was no evidence that that exposure was having any significant effect on him," that the dye packs' detonation could also cause panic, and that the experience of being in the presence of the actual detonation would not affect everyone in the same way. Trial counsel also elicited Dr. Burton's testimony that the angle at which the bullet entered the victim's body was not inconsistent with a scenario in which the victim was sitting in the car when the shooter unintentionally pulled the trigger while the gun was against the victim's arm.

GBI microanalyst Peterson testified that he first visually examined unaided and then under a low-powered microscope Nance's clothing items, including his gloves, socks, boots, denim jacket, red shirt, and jeans. He conducted no further tests on Nance's shirt or jeans because he did not detect any red or pink stains on those items. However, further testing of the other items confirmed the "faint" presence of the dye used in dye packs at the ends of both sleeves of Nance's jacket and on the tops of both of his socks, a heavier presence on two circular areas of each sock that corresponded with the cut-outs on Nance's boots, and a very heavy presence on Nance's gloves. On cross-examination, trial counsel elicited Peterson's testimony that the tear gas component of the dye pack dissipates much more rapidly than the dye dissipates and that the person wearing the items that he

examined "would have to be . . . either in the actual smoke or in an environment that was heavy with the material" because the red dye was present on several of the items. Moreover, Peterson opined that the person wearing Nance's socks, gloves, and jacket was, in fact, exposed to the dye packs' ingredients.

The State's firearm expert, Kelly Fite, testified that the .22 caliber bullet that was removed from the victim was "probably" fired from the gun recovered from Nance and that a gun had been fired from inside the black trash bag that was recovered from the Chevron station. During cross-examination, Moore elicited Fite's testimony that it took approximately one-third less pressure to pull the trigger of the gun used by Nance when the gun was cocked, as the evidence showed that it had been when it was recovered from Nance, thus increasing the chances of an unintentional trigger pull. Fite's testimony on cross-examination also showed that it was more likely that a person wearing gloves, as the evidence showed Nance had been, would unintentionally pull the trigger.

Trial counsel also elicited testimony from various State witnesses to support their theory that Nance never intended to harm anyone and that he was remorseful, including testimony showing the following: despite Nance's threats to the tellers, he never attempted to reenter the bank; he made repeated threats to shoot himself and never pointed the gun at anyone other than himself during the standoff; he had the gun aimed at his own head at the one time that he made a statement to the effect that there would be "war" if anyone "rushe[d]" him; he inquired of the Gwinnett County police sergeant who negotiated with him and convinced him to surrender to police whether anyone had been injured at the bank or the liquor store, cried, and inquired about his wife and family; he assured the negotiator that he did not want to die and that he would not harm the negotiator; he appeared remorseful to the detective who took his statement; and, according to Nance's statement, he grabbed what he believed was the money but was actually a black trash bag containing the gun when the dye packs detonated, ran across the street where he perceived the victim as trying to run over him, tried to scare the victim by firing a single shot into the air from inside the bag, and did not remember firing two shots or shooting anyone.

After the State rested its case in the guilt/innocence phase of the original trial, the parties announced to the jury that they had reached a stipulation that the results of a blood alcohol test on blood drawn from the deceased victim was .09 grams percent. Trial counsel presented testimony establishing that the victim was "dead for all intents and purposes" when emergency medical personnel arrived at the scene. A Gwinnett County officer who encountered Nance behind

the Chevron station where a Lilburn officer had chased him, testified that Nance "had been running," was "breathing heavily," was excited, had a gun in "a bag" and what appeared to be red dye on his face, threatened to kill himself, started to hyperventilate, and never pointed the gun at anyone but himself. Finally, a former Lilburn police officer testified to the following: as an officer responding to the scene, he first saw Nance as Nance crossed the highway and arrived at the Chevron station; Nance looked "[b]ewildered, confused," and "like he was wanting to fight" when the officer initially approached him; and his expression changed upon seeing the officer, and he said, "Just go ahead and kill me."

At closing, Wilson conceded that the State had established that Nance robbed a bank and engaged in a standoff with police, but he argued that the State had failed to prove that Nance committed a murder in the time between those two events. In support, Wilson first pointed to the evidence showing that McNeal could not identify what the argument between Nance and the victim was about, that Nance made no attempt to take the victim's car after the victim was shot, and that the gun was inside the black trash bag when it was fired, indicating that Nance did not display the gun to the victim, as he had done when he robbed the bank and as most armed robbers would do. Wilson then argued that there were several reasons to doubt the State's case, including inconsistencies between McNeal's testimony and testimony by other State witnesses, instances allegedly demonstrating that the State's investigation was incomplete, and the State's failure to present the recording of Nance's statement to police and the testimony of anyone who observed Nance immediately after the dye packs' detonation. Finally, Wilson reminded the jury of Dr. Burton's testimony regarding the physical effects of tear gas and his testimony that "even one of those . . . dye packs just going off can cause one to be frightened or disoriented," and he concluded that, while both the State's version and the defense's version of the shooting "w[ere] entirely possible and plausible," the State had the burden of proof. The jury returned a verdict finding Nance guilty on all counts, including malice murder and felony murder.

(3) *Presentation at the Sentencing Phase of the 1997 Trial*

Wilson testified at the habeas evidentiary hearing that trial counsel's mitigation theory at the original trial in 1997 involved "expanding on" their guilt/innocence defense theory. A review of the trial record shows that trial counsel attempted to do so by presenting testimony regarding Nance's troubled childhood that included verbal and physical abuse by his alcoholic adoptive father, Nance's own drug

and alcohol abuse, and his mental impairments and then arguing that the effects of the dye packs' detonation were exacerbated in Nance because of his impairments, causing him to act out of panic when he crossed the highway and shot the victim. To support their mitigation theory, trial counsel presented the testimony of two of Nance's family members and Dr. Shaffer.

We need not recite all the testimony of Nance's family members for the purposes of our analysis here. It is sufficient to note that the testimony of Nance's mother, Ellen Nance, and older brother, Johnny Nance, informed the jury that Nance was the middle of Ellen Nance's three sons; that Nance's mother married Jim Nance, who was not the father of her first two sons, shortly after Nance's birth; that Jim Nance adopted Nance and his older brother and was the only father that Nance knew; and that Nance's troubled childhood included developmental delays, an episodic alcoholic father, ostracization at school because of his mother's involvement with the Jehovah's Witnesses, significant learning problems, verbal abuse and physical punishment, a lack of display of affection from his parents, alcohol and drug abuse, three failed relationships with women, and a difficult work history.

Finally, trial counsel presented the testimony of Dr. Shaffer, who was qualified as an expert in the field of clinical psychology. His testimony showed that he initially had concerns that Nance might have a neuropsychological disorder or impairment because of a history of developmental delays and two significant childhood head injuries that resulted in unconsciousness. Therefore, when he initially met Nance in the mid-1990s, Dr. Shaffer completed a psychological evaluation of him that included the Halstead-Reitan Neuropsychological Test Battery, which is a specialized series of tests designed to examine the effects of brain injury or impairment on individuals. The results of those tests demonstrated that Nance scored in the impaired range on five out of eight tests, and Dr. Shaffer testified that his "overall impression . . . was that [Nance] does have a moderate degree of neuropsychological impairment consisting partially in the frontal lobes to the brain." He further explained that individuals with compromised frontal lobes do not make good decisions and do not appreciate the outcome of their decisions.

Dr. Shaffer also administered two standard IQ tests to Nance. Nance scored 77 on the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and 76 on the Stanford Binet, Fourth Edition, and Dr. Shaffer explained that both scores are "considered to be what we call the borderline range of IQ, meaning borderline mentally defective." Dr. Shaffer testified that the more recent IQ test that he administered to Nance "confirmed the results of the first test almost to the point"

and that "the pattern of scoring was almost identical, too, lending a certain credibility" to his belief that Nance was not malingering. He testified that Nance's scores were consistent with an individual capable of doing manual labor or warehouse work. Because Nance's IQ tests were "approaching 70, which is considered the cutoff for mental retardation," Dr. Shaffer explained that he assessed Nance's adaptive living skills and that it was his "impression" that Nance fell "roughly" in the ten-to-thirteen-year age group "in some aspects."

Dr. Shaffer testified that he had also conducted a personality assessment of Nance in which "[he] relie[d] quite intensively on the social history and the information provided by other informants who ha[d] had an opportunity to observe Michael Nance throughout his life." He stated that he spent 17 to 20 hours conducting the evaluation and that he obtained social history information from the family, from Nance, and from interviews with knowledgeable parties by investigators with the federal courts. Dr. Shaffer then recounted an extensive social history that included developmental delays, high fevers, childhood head injuries, and a dysfunctional family life with "an alcoholic, abusive stepfather who would routinely abuse the sons with types of punishment that were quite excessive, whippings using belts, switches that had thorns in them, wire hangers resulting in bleeding with welts on Michael Nance's body," Nance's being "pushed to the periphery of his father's experience," and an "oppressive atmosphere in the home" where "[t]he father did not tolerate conversation." He stated that Nance's maternal uncle, Jerry Chaffin ("Uncle Gene"), "picked up [Nance] from his elementary school class and began giving him alcohol, marijuana, and cocaine" and thus concluded that Nance "was taking cocaine and alcohol before he was out of elementary school," "had graduated to intravenous use of cocaine, crystal, crank, and occasionally heroin" by the age of 14, and that, "at age 15, there were two suicide attempts near his own home, each of which was thwarted by his brothers." He opined that Nance had not "had a chance to make choices in the way that most of us had a chance to make choices," because "his understanding[,] . . . judgment[,] and . . . reasoning ha[d] been impaired by these various neuropsychological deficits and by the severe psychological factors that ha[d] influenced him." On cross-examination, Dr. Shaffer also opined that "exposure to a situation such as a dye bomb going off or chaotic stimulus going on around [Nance]" would result in "his judgment [being] further impaired."

In closing argument at the sentencing phase of the original trial, Moore argued that the jury had heard credible evidence concerning Nance's brain impairments that manifested in developmental delays and learning problems, his ostracization at school because of his

religion, "his borderline retardation," and his alcoholic father's "yell-[ing] at him and call[ing] him stupid all the time, abus[ing] the mother and the children, . . . not allow[ing] affection for the children," and lack of "parental skills which might have helped [Nance] if they had been there." Moore contended that, "[i]n that environment, given his inabilities, [Nance] looked to . . . Uncle Gene for that affection . . . [that] he wanted [from] a father that loved him" and that, instead of giving Nance the nurturing that he needed, Uncle Gene took Nance, whom he described as "a person in a 13-year-old body . . . who's actually about seven years old," and "g[ot] him high on alcohol and drugs at an age when . . . he[ wa]s not old enough . . . to make mature decisions." Moore concluded that Nance's case was not a death penalty case. Rather, he contended that a sentence of life without parole was a severe punishment that would demonstrate the fact that "we, as human beings, do not kill people who have problems that are beyond their control." However, the jury rejected trial counsel's theory and recommended that a death sentence be imposed after finding that the State had proven beyond a reasonable doubt that Nance had a prior record of conviction for a capital felony and that Nance had committed the murder while he was engaged in the commission of another capital felony, the armed robbery of Balogh's vehicle. See OCGA § 17-10-30 (b) (1), (2). This Court affirmed Nance's convictions, reversed his death sentence, and remanded the case for resentencing. See *Nance*, 272 Ga. at 224 (6).

### C. *The 2002 Resentencing Trial*

Moore testified in the habeas proceeding that he and Wilson decided to switch roles after Nance's death sentence was vacated by this Court on direct appeal because, "[b]asically, the things that [he] had thought [they] ought to do didn't work, and [they] decided to see if [Wilson] had something that he could do differently that would work." Moore also testified that, while he and Wilson did not fundamentally disagree about how to present the sentencing phase, their mitigation strategy in 2002 "may have changed somewhat" in that Wilson took a slightly different approach. Wilson testified that, while their mitigation theory remained "pretty much the same concept" in both trials, they "tried to broaden [their] attack, and do it better the second time" because the jury in the original trial had recommended a death sentence.

### (1) *Investigation for the 2002 Resentencing Trial*

Wilson testified that counsel's mitigation theory at both trials involved Nance's mental impairments, childhood abuse and neglect,

and substance abuse. However, he explained that a significant difference at the resentencing trial was that trial counsel presented Dr. Daniel Grant, who was referred to them by their mitigation specialist, to testify regarding his research into prison adaptation and his opinion that Nance was adapting well to the prison environment instead of Dr. Shaffer as they had done at the original trial. Wilson also explained that he believed that jurors considered whether a defendant would present a danger to others if incarcerated rather than executed as a significant factor in determining whether to vote to impose a death sentence. Trial counsel also located several deputies who, if subpoenaed, would testify regarding Nance's good behavior while incarcerated awaiting his resentencing trial. Wilson testified that this testimony was important to show that Nance had adapted to the point that the deputies did not consider him to be dangerous and that he would not, in fact, present a danger in the prison system. Wilson also indicated that, as Dr. Grant was qualified as an expert in both prison adaptability and psychology and had conducted his own testing and evaluation of Nance, trial counsel did not abandon "the mental health defense." Rather, they intended to present evidence of Nance's "borderline intelligence" through Dr. Grant and the testimony of numerous lay witnesses, particularly Nance's family members.

Moore testified at the habeas evidentiary hearing that, when he and the defense investigator went to Kansas prior to the original trial to develop mitigating background evidence, Nance's family members, including his mother, were "very uncooperative" about admitting "the abuse or the shortcomings of the stepfather."[3] However, after the attorneys switched roles, Wilson and the defense team's new investigator/mitigation specialist traveled to Kansas, where they were "more successful" than Moore in getting family members to meet with them, provide information, and agree to testify. As a result, more of Nance's family members testified for the defense at the resentencing trial. Furthermore, the record supports the habeas court's finding that trial counsel met with the witnesses, including Dr. Grant, prior to the resentencing trial to prepare them to testify. After an independent review of the record, we conclude that the habeas court did not err in concluding that trial counsel conducted a thorough investigation prior to the resentencing trial.

---

[3] Although trial counsel repeatedly referred to Jim Nance both at trial and in the habeas proceeding as Nance's "stepfather," the record clearly establishes that Jim Nance legally adopted Nance when he was a child.

(2) *Presentation at the 2002 Resentencing Trial*

In his opening statement at Nance's 2002 resentencing trial, Wilson told the jury that the defense intended to present evidence about Nance's family, "how he grew up," his learning difficulties, a biological father that he never knew, his "introduction to alcohol and drugs at an early age," his "stepfather's alcoholism," and, finally, Nance's behavior during his most recent incarceration. Although the 2002 proceeding was a resentencing trial, the State presented basically the same evidence that it had presented in its case-in-chief in the guilt/innocence phase of the original trial to establish that Nance had committed Balogh's murder and the additional crimes of which he was convicted at that time. See *Hance v. State*, 254 Ga. 575, 577 (3) (332 SE2d 287) (1985) ("[I]n a resentencing trial . . . , while the state has no legal burden to establish guilt, as a practical matter the state must present sufficient evidence to allow this jury to independently satisfy itself of the defendant's guilt, as well as determine what punishment should be imposed."). Therefore, the State again presented evidence that Nance had committed the armed robbery of the Tucker Federal Bank as part of the facts surrounding the murder, as well as statutory aggravating evidence. Evidence that Nance had committed a prior Gwinnett County bank robbery and a 1984 armed robbery in Kansas was also again presented as statutory aggravating evidence. The State also introduced victim impact testimony and non-statutory aggravating evidence that Nance had felony convictions in Kansas for burglary and theft.

During cross-examination of several of the State's witnesses, trial counsel elicited testimony similar to that elicited at the original trial to support their theory that Nance did not intentionally shoot the victim and never intended to harm anyone. Also during cross-examination, trial counsel again elicited testimony about the contents of the dye packs and the possible effects of their detonation on an individual. Specifically, the jury heard that the dye packs were contained in "regular money," generally could not be recognized without training, and were activated only after they passed through the bank's door frame, thereby indicating that Nance had no reason to suspect that the pillowcases contained dye packs and thus was startled by their detonation. The jury also learned that the dye packs contained CS tear gas, red dye, potassium chlorate, and chemicals designed to produce an incendiary reaction; that persons directly exposed to tear gas may experience tearing and burning of the eyes, significant congestion, and difficulty breathing; and that an investigator counted the money from the pillowcases three to four hours

after the dye packs' detonation in an open area and that even this limited exposure irritated the investigator's sinuses.

GBI microanalyst Peterson testified for the State again at the resentencing trial, and trial counsel elicited his testimony on cross-examination that the stains on Nance's gloves were "very heavy" and that "the most common sense" reason for those stains was that Nance's gloves were "extremely near, if not touching," one of the dye packs when it detonated. Dr. Burton again testified on direct examination that he had training and experience in tear gas as part of his background in basic forensics and that he was familiar with CS tear gas that is typically present in a standard bank dye pack and its possible effects on an individual. He testified that, when a dye pack detonates, the following may occur: the individual is often startled by the detonation itself; the dye may get on the individual, "which startles [the individual] even further"; and CS tear gas can cause burning and tearing of the eyes, reflexive closure of the eyelids, reflexive coughing, irritation of the throat and lungs, and an asthma attack if an individual is asthmatic. On cross-examination, trial counsel elicited Dr. Burton's testimony that, "even if you know [a dye pack] is going off, it still may be somewhat startling" and that the fact that there was more than one dye pack in Nance's case could cause the detonation to be even more startling. Unlike in the original trial, Dr. Burton did not express an opinion as to whether Nance demonstrated that he was significantly affected by the CS tear gas.

Trial counsel presented 23 witnesses to support their mitigation theory involving Nance's troubled childhood, early drug use, learning difficulties, and prison adaptability. Numerous family members and Nance's third grade teacher testified regarding Nance's developmental delays and learning difficulties. The family members also testified about Nance's troubled background, including his abuse of drugs, the detrimental influence that his uncle had on him, and his adoptive father's binge drinking, abusive conduct, and dissatisfaction with him. Trial counsel also presented the testimony of the widow of Nance's deceased biological father, who testified that she reacted with anger when Nance came to their home approximately 20 years earlier to announce that he was her husband's son, that her husband had never had any contact with Nance prior to that day, and that he never established a relationship with Nance. Her daughter testified that she had only recently learned that Nance was her half-brother. Both women expressed support for Nance, and Nance's half-sister asked the jury for mercy so that she and her children could have the opportunity to get to know Nance. Nance's former fiancée testified that she met Nance in 1977 at a meeting of Jehovah's Witnesses when Nance was approximately 16 years old, that they were engaged to be

married in 1980, and that she called off the engagement shortly before their wedding date because "[Nance] wasn't making wise decisions."

Trial counsel presented seven Gwinnett County sheriff's deputies, who testified regarding Nance's good behavior while incarcerated in the Gwinnett County Detention Center for approximately a year and a half awaiting his resentencing trial. Their testimony showed that during this time period, Nance had been selected by the floor deputies to be a unit worker in the J-Pod, which was the maximum security unit of the detention center. Unit workers were selected by the floor deputies based on their good behavior and calm demeanor, were allowed to move about the entire pod, and had access to brooms, mops, and cleaning material. As a unit worker, Nance assisted the floor deputy with the upkeep of the pod, did general errands, and passed out food trays and clean uniforms to inmates, and he had earned the weekly award for keeping the cleanest pod in the detention center several times. The deputies described Nance as a "model" and an "ideal" inmate who obeyed the rules and regulations, cooperated, worked hard, never caused a problem, and once advised a young man who was touring the detention center that "[he'd] end up in jail" if he continued to disobey his father. Two ministers who had become spiritual mentors to Nance testified that he was remorseful, was a changed man, had "given his heart to the Lord," wanted to be baptized, and was very involved in Bible study.

Finally, trial counsel presented the testimony of Dr. Grant, who explained the methods and procedures that the Department of Corrections would employ in assessing and classifying Nance and the ways in which the prison system deals with discipline problems and provides for the community's safety. Dr. Grant also testified that he had reviewed all of Nance's jail and prison records and that he had spoken with members of Nance's family and officers at the detention center, and he opined that Nance "would make a good adjustment to prison life based on all the available information." He also testified that he was not surprised by Nance's recent good behavior at the detention center, opined that his behavior in prison would be similar, noted that the disciplinary actions against inmates for aggressive or violent behavior generally decrease significantly as inmates reach the ages of 40 to 46 years, and then testified that Nance was 41 years old. Dr. Grant also testified regarding Nance's mental impairments and employment limitations, and that testimony is discussed in detail below.

In closing arguments at the end of the resentencing trial, Wilson acknowledged that Nance was responsible for Balogh's death and deserved to be punished for that crime. However, he argued that a

sentence of life without parole was a severe enough punishment, pointing out that the evidence presented regarding Nance's childhood had definitely shown some verbal abuse and an "episodic alcoholic father in the home." He reminded the jury of family members' testimony describing Nance as "the lost child," who was affectionate, a slow learner, neither parent's favorite, and unable to please his father. He also pointed to the testimony about Nance's developmental delays and difficulties at school, his father's frustration with him and resultant labeling of him as "stupid," his mother's devotion to her work and to church at the expense of being at home with Nance, his father's taking Nance with him to bars, his introduction to drugs and alcohol and to stealing to support his drug use by the uncle who was his only male authority figure, his learning the startling news as a young man that Jim Nance was not his real father followed closely in time by experiencing the rejection of his biological father and then his fiancée, and his struggles maintaining a job.

Wilson also argued that the evidence supported an inference that, while Nance intended to rob the bank, he never intended to harm anyone, and he recited the State's own experts' testimony to support his contention that Nance "was indeed startled, scared, teary eyed, a little bit dazed from that concussion, the dye, the smoke, and the tear gas as he ran across the street toward that liquor store." Wilson further argued that, while "there's pretty good evidence [that Nance] was trying to take [Balogh's] car from him" at the liquor store,[4] the evidence showing that the gun was still in the black trash bag at the time, that Nance did not remove Balogh from the car and take the vehicle, and that the bullet first entered Balogh's elbow all supported an inference that the shot that killed Balogh was unintentional. Wilson reminded the jury of the deputies' testimony regarding Nance's good behavior while incarcerated; Dr. Grant's testimony that Nance was adjusting well to incarceration; the testimony of Nance's two spiritual mentors that he worked hard to correspond with them, study his Bible lessons, and improve himself; and the evidence that Nance was and continued to be remorseful for his actions. He then concluded that Nance was not the type of person for whom the death penalty was designed. Nevertheless, the jury found that the State had proven the presence of the same two statutory aggravating circumstances as found in 1997 and recommended a death sentence for Balogh's murder.

---

[4] Nance was convicted and sentenced for criminal attempt to commit armed robbery in connection with this incident at his original trial, and that conviction was affirmed by this Court. See *Nance*, 272 Ga. at 217, 224 (6).

(3) *The Habeas Court's Conclusions Regarding the 2002 Resentencing Trial*

The habeas court concluded that Nance received ineffective assistance of counsel at his resentencing trial because trial counsel did not present testimony like that of Dr. Shaffer's 1997 testimony regarding Nance's mental impairments or testimony like that of Dr. Leslie Hutchinson in the habeas proceeding regarding the possible effects of the dye packs' detonation on Nance. This Court reviews those conclusions de novo. See *Dewberry v. State*, 271 Ga. 624, 625 (2) (523 SE2d 26) (1999) (holding that what witnesses to call is a tactical decision and that whether an attorney's trial tactics are reasonable is a question of law, not fact).

(a) *Omission of Testimony at the 2002 Resentencing Trial Regarding Nance's "Borderline Mental Retardation" and "Borderline Intellectual Functioning"*

The habeas court first concluded that trial counsel were ineffective in not presenting expert testimony at the resentencing trial to "make clear to the jury that [Nance]'s intellectual limitations amounted to borderline mental retardation." However, Nance's own expert, Dr. Scanlon, testified at the habeas evidentiary hearing that the psychological diagnosis of "borderline mental retardation" has been eliminated because it is no longer considered to be "relevant terminology." See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR"), 41-45 (Text Rev. 4th ed. 2000) (providing no reference to "borderline mental retardation" in the section listing and describing the various severities of "mental retardation"); id. at 740 (defining an IQ in the 71-84 range as "borderline intellectual functioning"); see also *Carroll v. Crosby*, No. 6:05-cv-857-Orl-31KRS, 2008 U. S. Dist. LEXIS 720926, at *44, n. 12 (M.D. Fla. June 20, 2008) (noting that the DSM-IV-TR does not provide a clinical definition of "borderline mental retardation").

Furthermore, Dr. Grant testified at the resentencing trial that, according to his testing, Nance had an intelligence quotient of 82, and although he did not use the term "borderline intellectual functioning" to describe Nance's low IQ, he testified that Nance's IQ placed him in the twelfth percentile of functioning and explained that 88 percent of those individuals who took the same IQ test that he administered to Nance scored better than Nance did. Regarding language skills, Dr. Grant testified that Nance's scores on oral expression and listening comprehension were lower than his general level of intelligence, and he indicated that Nance's skills in those areas were comparable to those usually seen in early adolescence. Dr. Grant also testified that

Nance's reading was at an early fourth grade level, that his reading comprehension was also at the fourth grade level, that he was "a very slow reader," that he scored "at the [0].2 percentile" in memory functioning, and that he had difficulty encoding information, requiring "more repetition" to grasp information.

When asked by trial counsel how Nance's level of functioning would have caused him problems in his ability to work, follow rules, and keep a job, Dr. Grant responded that, beginning in school, Nance likely would have been classified either as a "slow learner" or placed in a learning disability program and that his ability to function was at a lower level. Dr. Grant explained that Nance's problems with memory and learning made it harder for him to learn job skills and that teaching him those skills required repetition and patience on the part of his employer. Dr. Grant noted that Nance's younger brother had said that he had once completed a job application for Nance because Nance appeared unable to do so. Dr. Grant concluded that Nance was employable but that his job choices were necessarily limited to lower level, repetitive type work.

Trial counsel also presented testimony from Nance's third grade teacher at the resentencing trial. She testified that she recognized from the beginning of the school year that he had problems in reading, math, and other major areas and that she, Nance's mother, and the principal decided together that Nance should be retained. She testified that school policy at that time prevented her from writing personal comments into school records, but she recalled being aware of Nance's lack of progression with the rest of the class and her inability to identify the problem. She also testified that Nance was not a lazy student and worked at the requirements set before him; it just appeared to her that the work was too hard for him. She explained that she had had no training in how to identify learning problems in children and the school had no special education programs at the time that she taught Nance. However, based on her experience and the training that she subsequently received, she opined that Nance probably had learning disabilities at the time and that he would have benefitted significantly from special education classes. Trial counsel introduced Nance's third grade school records, and his former teacher pointed out from those records that Nance's reading grades were "a total failure in [his] first year" of third grade, that his grades in the remaining major subject areas were all in the "needs improvement" range, and that he did not show improvement until midway through the second semester of his second year in the same curriculum.

In addition to this testimony, several family members testified at the resentencing trial that Nance had always been "slow." Nance's

mother again testified concerning his developmental delays and his learning difficulties in school. Nance's maternal aunt, who lived with Nance when he was seven, eight, and nine years old and again when he was approximately thirteen years old, testified that "[Nance] was really slow," "had a learning disability," and "was like almost retarded." She testified that she often helped Nance with his schoolwork, that she always had to go through his studies with him and repeatedly explain "a lot of things" to him "a lot more often" than she did with his brothers, and that Jim Nance "would get after [Nance] a lot more [than he got after his brothers] because . . . of his not being able to comprehend things as well as the other boys."

Both of Nance's brothers testified that Nance's grades were always poor, which frustrated Nance's father, and that Nance's father called him names and physically punished him as a result. Describing the same situation as Dr. Grant, Nance's younger brother, Doyle, testified that he assisted Nance, then a young man, in completing his job application. Doyle also testified that Nance was called "Sped" by fellow students in junior high school because he was in special education reading classes. Nance's older brother, Johnny, described the difficulties that Nance had maintaining a job after he was paroled from a Kansas prison and came to live with Johnny in Georgia. A minister testified that he noticed when he began an individual Bible study with Nance that he had difficulty with retention.

This review of the record shows that trial counsel did present significant evidence at the resentencing trial regarding Nance's low intelligence and how it affected his life. Furthermore, on cross-examination, Dr. Grant indicated in response to the district attorney's specific questioning that Nance's IQ score placed him in the low average range in intelligence and *not* in the mental retardation range, and he explained that Nance's low IQ did not mean that he was incapable of living in society, holding a job, and being a law-abiding citizen. However, Dr. Grant still did not use the terms "borderline intellectual functioning" or "borderline mental retardation" to describe Nance's level of intelligence as Dr. Shaffer did in the original trial, and trial counsel could have reasonably concluded that, if he did so, the State likely would present their own expert, Dr. Theresa Sapp, to testify in rebuttal, as it did in the original trial, to explain to the jurors that "borderline mental retardation" is *not* mental retardation and to explain the difference that exists between "borderline intellectual functioning" and mild mental retardation. Specifically, at the sentencing phase of Nance's original trial, Dr. Sapp, who had conducted a pretrial evaluation of Nance, testified that Nance's score of 77 on the

IQ test administered to him by Dr. Shaffer "f[e]ll[ ] within what is known as the borderline range of intellect." Then she explained the following:

> In that range of intellect, a person is generally capable of achieving secondary education. They may have to repeat certain classes, but they're generally able to hold down a job, they're able to live independently.

Dr. Sapp differentiated persons with mild mental retardation by stating that they were usually incapable of achieving beyond the sixth grade level. She testified that Nance was unclear about what grade he completed in school but that he did tell her that he completed his GED while in prison.

Dr. Sapp also testified that she asked Nance about his work history, that she determined from his responses that Nance did what he perceived to be in his best interests, and that she did not get the sense that Nance was ever forced out of a job or unable to work because of factors other than his own choices. Moreover, had Dr. Sapp been called again by the State as a rebuttal witness, she likely would have testified, as she did at the original trial, that she perceived indications that Nance was malingering during her evaluation of him. Based on the foregoing, we fail to see how trial counsel were deficient in not ensuring that Dr. Grant or another expert used the term "borderline intellectual functioning" or "borderline mental retardation" when describing Nance's impairments.

Moreover, on the question of possible prejudice, we conclude that there was not enough of a difference between the evidence presented during the resentencing trial and the evidence presented in the habeas proceeding regarding Nance's low level of intelligence to establish a reasonable probability of a different outcome and that Nance was not prejudiced by the fact that no expert used those terms in his resentencing trial to describe his mental impairments. See *Schofield v. Holsey*, 281 Ga. 809, 813-814 (II) (642 SE2d 56) (2007) (finding no prejudice where counsel failed to supply materials to their mental health expert that would have enabled the expert to testify that, while not mentally retarded, the petitioner had borderline intellectual functioning, because trial counsel presented *other* evidence of the petitioner's mental slowness and because the new testimony would not have made a significant contribution to his mitigation evidence in light of the evidence that counsel actually presented); *Herring v. Secretary, Dept. of Corrections*, 397 F3d 1338, 1351 (11th Cir. 2005) (finding no prejudice where counsel did not introduce two psychological reports regarding petitioner's mental

disability and emotional problems, because, among other things, the reports were "cumulative" of the petitioner's mother's trial testimony that he had a low IQ and a learning disability).

(b) *Omission of Testimony at the 2002 Resentencing Trial That Nance Has Organic Brain Damage*

The habeas court also found that Nance's counsel were ineffective at his resentencing trial for omitting any expert testimony that Nance has organic brain damage. As discussed above, trial counsel testified that presenting evidence of Nance's "mental impairments" remained a part of their mitigation theory at the 2002 resentencing trial and specifically stated that presenting evidence of his "borderline intelligence" was a part of that theory. However, our review of the trial and habeas records reveals no evidence to support the habeas court's conclusion that evidence of Nance's "brain damage" continued to be a part of the defense strategy at the resentencing trial. Moreover, to demonstrate deficient performance, Nance must "show that counsel's representation fell below an objective standard of reasonableness" and that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U. S. at 688, 690. Thus, an attorney's testimony on such an issue is not determinative. A review of the trial transcript indicates that a reasonable lawyer under the circumstances could have strategically chosen not to present such evidence. See *Waters,* 46 F3d at 1516-1517 (noting that, even though testimony at the habeas evidentiary hearing was ambiguous, acts at trial indicated that counsel exercised sound judgment).

Furthermore, the habeas court erred as a matter of law when it concluded that trial counsel's deliberate decision not to present Dr. Shaffer's testimony in the resentencing trial was not "tactical or reasonable." The habeas court based this conclusion on its findings that "[t]rial counsel's sole stated reason for failing to present Dr. Shaffer's mitigating testimony [at the 2002 resentencing trial] was that his credibility had been 'impeached' on cross-examination at the 1997 trial," that trial counsel were concerned that the district attorney would be able to discredit his testimony in the resentencing trial in the same way, and that trial counsel could have provided Dr. Shaffer with the investigative materials that they collected to support their 2002 mitigation theory to ensure that his findings would not be challenged in the way that they were in 1997. However, as the following discussion shows, the record supports Moore's testimony that the credibility of Dr. Shaffer's testimony was attacked in several ways at the 1997 trial and that trial counsel had a legitimate concern that it would be susceptible to the same attacks in the resentencing trial. Our review of the record also shows that the new information

that trial counsel had collected for the resentencing trial would not have made Dr. Shaffer's testimony less susceptible to attack than it was in the 1997 trial.

(i) *Counsel's Decision Not to Present Dr. Shaffer's Testimony at the 2002 Resentencing Trial*

In explaining the decision not to present Dr. Shaffer's testimony at the resentencing trial, Moore testified at the habeas evidentiary hearing that "Dr. Shaffer's testimony did not go well" at the original trial because it was discredited. While unable to recall "the specifics," Moore indicated that there were issues involving "the origin" of some of Dr. Shaffer's information upon which he based his opinions. Moore acknowledged that it would be virtually impossible for a psychologist to personally interview every witness on whose statement the psychologist relied and that no court would approve the "astronomical" funding that doing so would require. He also acknowledged that some of the information about which Dr. Shaffer was impeached might not have been critical to the outcome of his evaluation and that Dr. Shaffer "fought back a little" by explaining to the jury that mental health experts commonly rely on statements obtained in interviews contained in investigators' reports. Nevertheless, Moore testified that, "when an expert witness does not know the underlying facts in the case, [he] believe[d that] it compromise[d] [the expert's] credibility with the jury," that there were "a number of things" that successfully challenged Dr. Shaffer's testimony, that the district attorney succeeded in making the point to the jury "that everything that Dr. Shaffer had was basically hearsay based on what somebody told him," that Moore considered the district attorney's point a legitimate one, and that he and Wilson agreed that "Dr. Shaffer's testimony had been compromised in the case." See *Whatley v. Terry*, 284 Ga. 555, 565 (V) (A) (668 SE2d 651) (2008) (although an expert witness may rely on others' statements in forming an opinion, the opinion should be given weight only to the extent that those statements are found reliable, and an expert witness must *not* be permitted to serve merely as a conduit for hearsay).

Moore also testified that he and Wilson reviewed the transcript of the 1997 trial and that the defense team held multiple strategy meetings to discuss what they had done at the 1997 trial and what they should or should not do differently at the resentencing trial. The record also shows that, approximately six months before the resentencing trial, Moore and Wilson held a meeting with Dr. Shaffer, where they reviewed Nance's previous psychological evaluations and discussed the possibility of Dr. Shaffer testifying in the resentencing trial. Moore testified that trial counsel chose not to present Dr.

Shaffer's testimony again because they decided "that the cross-examination that [the district attorney] had done in the first trial would affect [Dr. Shaffer's] testimony in the second trial." Moore could not recall Dr. Shaffer's opinion on the matter, but he did recall that Dr. Shaffer felt that "[the district attorney] had successfully discredited some of his testimony." Based on the foregoing discussion, we conclude that the habeas court erred as a matter of law in concluding that trial counsel's decision not to present Dr. Shaffer's testimony at the resentencing trial was not a tactical decision.

(ii) *Discrediting of Dr. Shaffer's 1997 Testimony*

Furthermore, a review of the 1997 trial transcript shows that a reasonable attorney could have concluded that Dr. Shaffer's testimony had been discredited. Without citing to every instance that could be construed as discrediting his testimony, we note that during cross-examination the district attorney challenged the source and veracity of several alleged events in Nance's history — such as two childhood head injuries resulting in unconsciousness, "a series of illnesses with high fevers," and severe physical and emotional abuse — that Dr. Shaffer recounted and relied on to form his diagnoses. The district attorney based his challenges on the fact that there had been little or no testimony from the family members who had testified to substantiate the alleged events or the fact that, in some instances, there had even been arguably contradictory testimony from those family members.

The district attorney also questioned witnesses about information contained in Dr. Shaffer's report, and some of their responses undermined the credibility of Dr. Shaffer's report. For instance, in response to the district attorney's questioning on cross-examination, Johnny Nance testified that he had not personally spoken with Dr. Shaffer but had indirectly provided him with information regarding Nance's childhood. Referring to Dr. Shaffer's report, the district attorney then asked Johnny Nance if he had been the one who had relayed to Dr. Shaffer that Nance was called on by family members to kill injured animals, which was an alleged part of Nance's childhood that Dr. Shaffer relied on to support his conclusion that Nance "was not hampered by emotional attachment." Johnny Nance responded, "No, I didn't say it like that." He then described to the jury a childhood incident that presented an entirely different picture of Nance and his background than the one that Dr. Shaffer described in his report and testimony.

Based on the foregoing, as well as a thorough review of the remainder of the testimony at the sentencing phase of the 1997 trial, and considering the fact that the jury that heard that testimony recommended that Nance receive a death sentence, we conclude that

a reasonable lawyer could have decided that Dr. Shaffer's testimony had been discredited and that the mitigation theory should be adjusted accordingly.

(iii) *How the New Material Would Have Affected Dr. Shaffer's Testimony*

Finally, contrary to the habeas court's finding that trial counsel could have provided Dr. Shaffer with the new material that they collected in support of their 2002 mitigation theory to ensure that his findings would not be challenged in the way that they were in 1997, our review of the 2002 trial transcript shows that, because of the new material presented in support of their mitigation theory at the 2002 resentencing trial, Dr. Shaffer's testimony likely would have been *even more discredited* had it been presented at the resentencing trial. For example, Dr. Shaffer opined that Nance's "difficult" home life "resulted in . . . an emotional distancing by [Nance]," that Nance "tended to withdraw, to shut down, [and] to not have the usual range of feelings of attachment or connection to people." This testimony would have been contradicted by the testimony of many of the family members in the resentencing trial who testified that Nance was "a very loving, affectionate person," was "the most friendly, the most affectionate . . . , [and] had the . . . warm[est] personality of the three [boys]," was "compassionate," and "really loved people."

The family members' testimony at the resentencing trial regarding Nance's early drug use would have also been damaging to the credibility of Dr. Shaffer's testimony. As discussed above, Dr. Shaffer testified at the 1997 trial that one of the factors in Nance's background that he relied on in making his diagnoses was "Uncle Gene" Chaffin's influence in introducing Nance to drug use at an extremely early age. According to the history that Dr. Shaffer relied on and relayed to the jury in 1997, Chaffin "picked up [Nance] from his elementary school class and began giving him alcohol, marijuana, and cocaine." Dr. Shaffer explained that such an early abuse of drugs by Nance was significant because it led to "an arrested development . . . in a young boy who basically stop[ped] all opportunity at this point for normal interactions with peers and with society and with parents due to the fact that he's ingesting drugs."

The witnesses at the resentencing trial generally agreed that Chaffin introduced Nance to drugs; however, no witness testified that he did so as early as elementary school age. Unlike in 1997 when Nance's mother testified that she "underst[oo]d" that Chaffin had picked Nance up from elementary school and taken him to do drugs but had no personal knowledge of that fact, Nance's mother testified at the resentencing trial that Nance was "[p]robably . . . 17 or 18"

when he started spending time with Chaffin. Chaffin himself testified at the resentencing trial that he supplied Nance with drugs beginning when Nance was approximately 19 years old. While Chaffin may have had an incentive to lie to protect himself, Beverly Metcalf, his ex-wife who was married to him during the relevant time period, also testified at the resentencing trial, and she would have had no apparent reason to be untruthful. Moreover, given that she had been a certified chemical dependency counselor since 1980, was the president and CEO of a company that provided chemical dependency treatment and prevention services in both community-based and correctional settings throughout the state of Kansas, and testified that she considered Chaffin's influence on a young Nance "unconscionable," the jury likely found her testimony regarding Nance's drug use highly credible. Metcalf testified that she first met Nance when Chaffin was 19 years old and Nance was approximately 12 years old, shortly after she and Chaffin began their relationship, and Chaffin started "hanging out" with Nance when Nance was 18 or 19 years old. While Metcalf acknowledged that Nance could have been "as young as 16[ or] 17," she specifically denied that he was an 11- or 12-year-old child when Chaffin began influencing him to become involved with drugs. Finally, numerous family members testified that Nance's drug use began at approximately 16 to 20 years of age, but no one testified that he began using drugs near elementary school age, including Nance's younger brother who testified that he had used drugs with Nance and Chaffin.

The witnesses' testimony at the resentencing trial regarding Nance's childhood abuse from his alcoholic father also would have undermined the credibility of Dr. Shaffer's testimony. After Nance's mother testified on cross-examination that Jim Nance "just threatened" to strike Nance, trial counsel questioned her on redirect about seeing Jim Nance "get violent" toward Nance. She testified that "it was mostly yelling," that Jim Nance "probably put [Nance] up against the wall once or maybe twice," that "[Jim Nance] picked up something like a ball bat . . . one time and threatened [Nance] with it" after Nance had grown bigger than his father, and that she had been present when Jim Nance used his belt to discipline the boys but did not recall his having ever used a switch. Nance's maternal aunt, who lived with the family for portions of Nance's childhood, testified that she watched the boys and helped them with their homework, that Jim Nance was "gruff" and "grouchy," that he "holler[ed]" at Nance more than at his brothers, that he spanked the boys sometimes, but that she only saw Jim Nance get drunk "a few times" in the years that she lived with them and that she never saw him physically abuse Nance or do anything more than spank the boys when disciplining them.

Although one of Nance's maternal uncles, who lived with the family for eight months when Nance was approximately nine years old, testified that Nance would drink for three to four days at a time and then remain sober for a week and that the boys were called names like "[d]ummy, stupid, MF, [and] idiot" and were spanked with a belt and on occasion with a hose, he also testified that "[he] was disciplined in the same way when [he] was a boy," that he never considered contacting police or child protective services, and that he considered Jim Nance "a good father," although "his drinking kind of clouded his responsibilities a lot." In fact, only the testimony of Chaffin approached Dr. Shaffer's description of physical abuse. Chaffin testified that he had seen all three of the Nance boys beaten by Jim Nance, who "might" be sober two days a month; that Nance got most of the abuse and was a "terribly abused child"; that Jim Nance often beat Nance with a hanger and that one of his favorite "whipping tools" was "a board with holes in it"; and that, in his opinion, he "wasn't any father at all." Aside from the fact that Chaffin admitted that he "didn't like" Jim Nance, as the district attorney pointed out in closing argument, there are several reasons why the jury reasonably could have found Chaffin's testimony incredible. According to the testimony of Nance's brothers, Jim Nance would binge drink an average of three to five days every one to two months; their mother, and *not* their father, whipped Nance one time with a hanger; and Jim Nance did not even own a board with holes in it to use for spanking them. Nance's brothers also testified that Jim Nance was a strict disciplinarian who was concerned with his sons' grades and disciplined them by grounding them, taking their allowance away, or spanking them with a belt or a switch, depending on the circumstances; that Nance often brought home poor grades; and that their father would punish Nance by grounding him, yelling at him, and sometimes calling him "dumb" or "stupid." Doyle Nance testified that his father "occasional[ly]" struck Nance with his hands when he was drinking, but the only specific instance that he could recall was one time when his father "put a nice big handprint right on Michael's back" when "he hit him pretty hard." Johnny Nance testified that he never saw Nance beaten with a switch with thorns in it.

In addition to this testimony, multiple other witnesses, including Nance's third grade teacher and Chaffin's former wife, who was a counselor familiar with abused individuals, testified that they never saw any evidence that Nance was severely physically abused. Therefore, a reasonable lawyer could have concluded that the type of testimony of severe physical abuse on which Dr. Shaffer had partially

relied in forming his opinion in 1997 regarding Nance's deficits was not supported by the evidence available to present at the resentencing trial.[5]

Finally, it is noteworthy that in the resentencing trial counsel deliberately adjusted their mitigation theory to include a defense that described Nance as a changed person. The jury heard from several witnesses who described Nance as having reformed his conduct, turned to religious studies following his incarceration, and established a good disciplinary record while incarcerated in the detention center awaiting his resentencing trial. It is a reasonable conclusion, and within trial counsel's purview of professional judgment, that evidence of frontal lobe damage to explain Nance's behavior at the time of the murder would have undermined their mitigation theory that he was a changed man, had adapted to prison life, was learning to make wise decisions, and would make "an ideal inmate." Specifically, Dr. Shaffer testified in 1997 that persons with neuropsychological test scores similar to Nance's scores did not make good decisions, because they did not "seem to understand what the results of certain actions are going to be." He also testified that Nance's understanding, judgment, and reasoning were impaired as a result of his brain damage to the point that he had not had an opportunity "to make choices in the way that most of us have had a chance to make choices." A reasonable lawyer could have believed that the jury would view Dr. Shaffer's testimony as aggravating in light of Dr. Grant's testimony regarding prison adaptability and Nance's prospects of adapting in a prison environment.

When explaining prison behavior, Dr. Grant testified that "[e]very behavior that is appropriate or is not appropriate has a consequence so that people learn to adjust or . . . they have a lot of problems." Dr. Grant also opined that a person like Nance, who had been impulsive and made bad decisions in the past, could learn to follow the strict rules in the prison system because of the consistent consequences that were attached to inappropriate behavior. On cross-examination, he responded to the district attorney's inquiries about past disciplinary actions against Nance by citing examples that he asserted demonstrated that Nance was learning to control his impulsivity and make good decisions. A reasonable lawyer could have viewed Dr. Shaffer's testimony as undermining that of Dr. Grant, given that Dr. Shaffer would have testified that Nance's impulsivity and past bad

---

[5] In fact, Wilson told the jurors in his opening statement that they "might" hear testimony about Nance's abusive father. In closing, Wilson told the jury that "[p]erhaps" the evidence showed some physical abuse.

decisions were due to his frontal lobe damage, something over which he had no choice. See *Rhode v. Hall*, 582 F3d 1273, 1285-1286 (11th Cir. 2009) (holding that counsel were not deficient for not presenting evidence of defendant's organic brain damage where counsel "tried to show that [the defendant] could adapt to prison" and reasonably believed that the jury would see the evidence as aggravating).

Thus, we conclude that trial counsel's decision not to present the testimony of Dr. Shaffer or any other expert[6] that Nance has brain damage, given the availability of other mitigating evidence, falls within the bounds of sound trial strategy. See *Martinez v. Dretke*, 404 F3d 878, 890 (5th Cir. 2005) (holding that counsel's decision not to present evidence of organic brain damage, "given the availability of other, less damaging, mitigating evidence, fell well within the bounds of sound trial strategy").

(iv) *Prejudice Analysis*

Moreover, even assuming that trial counsel's strategies fell below professional norms, they cannot form the basis of an ineffective assistance of counsel claim, because there is no evidence that they prejudiced Nance. In assessing prejudice, we "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U. S. at 695. In addition to mitigating evidence presented by the defense, the jury also had before it the following State's evidence, much of which the district attorney cited to support his closing argument that Nance was "a smart bank robber." In committing the bank robbery, Nance wore gloves and used a gun and a vehicle that he did not own, which would have made it difficult to connect the gun and the vehicle to him if there had been no dye packs placed in the pillowcases. He

---

[6] The habeas court found that trial counsel could have presented testimony that Nance has frontal lobe damage "through any number of experts, including . . . Dr. Grant . . . , or even the State's expert Dr. Sapp." However, Dr. Grant did not prepare a report of his evaluation of Nance, he did not testify at trial that he diagnosed Nance with frontal lobe damage, and he averred in the habeas proceeding that "[his] memory remains very vague" about his evaluation because he is now unable to locate and review his file on Nance. Thus, there is no evidence in the record that Dr. Grant has ever diagnosed Nance with frontal lobe damage. Dr. Sapp, who is not a neuropsychologist and conducted only a mental status examination of Nance, stated in her report that she would only diagnose Nance with *polysubstance dependence, personality disorder,* and *borderline intellectual functioning,* and she did not testify that she agreed with Dr. Shaffer's diagnosis that Nance suffered frontal lobe damage. In fact, she noted in her report that "no residual effects of possible organic impairments were noted" other than Nance's inability to recall certain facts, including "events leading up to the charges and arrest." Dr. Sapp opined that "a plausible explanation" for Nance's lack of memory was "that some facts were not stored because of lack of interest and intoxication." We also note that Dr. Scanlon, who relied on Dr. Shaffer's evaluation to tentatively diagnose Nance with "cognitive disorder not otherwise specified" in his 1994 report, testified when asked about Dr. Shaffer's diagnosis in the habeas proceeding: "[A]s far as I know, there's no concrete evidence that [Nance] has actual structural damage to the frontal lobes."

entered the bank with the gun loaded with nine live rounds, had nine more live rounds in his pocket enabling him to fully reload the gun, presented himself as a customer, and did not pull the rolled-up ski mask down to cover his face, pull out his gun, and identify himself as a bank robber until he had an opportunity to observe who was in the bank and the circumstances that existed there. He specifically targeted a teller who was on the telephone at the time with a threat that she would be "the first to die" if the police came, in an apparent attempt to prevent her from calling the police. He threatened to come back and kill the tellers if they placed dye packs in with the money. He shot one victim and assaulted another in attempting to steal a getaway car after the dye packs' detonation sprayed the vehicle that he was driving with tear gas. He kept his gun pointed away from any officer and refrained from doing anything to endanger himself during the hour-plus standoff, and he was able to negotiate police into allowing him to make a telephone call to his wife before finally surrendering. Within hours of his arrest, he denied any involvement in the prior Gwinnett County bank robbery and wanted to know "what kind of deal [he could] get." The jury also had before it evidence of Nance's numerous other convictions, including a robbery in which Nance also threatened the teller if she placed a dye pack in with the money. The evidence depicted a man capable of planning and executing criminal acts and willing to victimize anyone who would get in his way, which was more than sufficient to belie any "no choice" defense that Nance could have asserted.

(c) *Omission of Dr. Hutchinson's Testimony Regarding the Dye Packs at the 2002 Resentencing Trial*

The habeas court also found that trial counsel were ineffective for omitting the testimony of Dr. Leslie Hutchinson, a medical doctor specializing in environmental and occupational medicine, at the resentencing trial. The record shows that trial counsel met with Dr. Hutchinson immediately prior to the 1997 trial and that they disclosed their intention to call Dr. Hutchinson as a witness in the case "to testify as to the effects of tear gas on human beings" on the first day of trial. However, trial counsel did not call Dr. Hutchinson or any other expert to testify in this area in 1997. At the habeas evidentiary hearing, Dr. Hutchinson was qualified as an expert in the field of toxicology and chemical weapons, and he testified that, based on Nance's mental impairments and his opinion that Nance was significantly exposed to CS tear gas, "[Nance's] statement that he didn't know that he had actually fired the gun is plausible and more likely than not true."

(i) *Trial Counsel's Performance*

At the habeas evidentiary hearing, Moore testified that the defense team investigated obtaining a forensic toxicologist to testify at the guilt/innocence phase of the 1997 trial but that, after "talking to a number of people," including the manufacturer of the dye packs, "[they] were never able to find an expert [they] felt like [they] could use." Neither of Nance's attorneys could recall the details of their meeting with Dr. Hutchinson. Dr. Hutchinson testified that he gave trial counsel only "an oral report of a calculation . . . of the concentration of CS [tear gas that] would [have been] in an enclosed car," but that he would have been willing and able to testify at the original trial in the same way that he testified in the habeas evidentiary hearing had he been provided the material that habeas counsel provided to him, including police reports, the safety data sheet on the dye packs, and Dr. Shaffer's report. Thus, there is evidence in the record to support the habeas court's finding that Dr. Hutchinson's testimony was readily available to trial counsel prior to the resentencing trial.

Wilson testified at the habeas evidentiary hearing that he could not recall the reason why counsel did not present Dr. Hutchinson's testimony but that he knew at the time of trial why Dr. Hutchinson was not called. Wilson did recall that the defense was able to elicit "some information about tear gas and its effects from State's witnesses who testified." As previously discussed, trial counsel elicited significant testimony at the 1997 trial regarding the effects of tear gas and GBI microanalyst Peterson's opinion testimony that Nance was exposed to the dye packs' components. Furthermore, after explaining Nance's mental impairments to the jury in the sentencing phase of the 1997 trial, Dr. Shaffer testified that "exposure to a situation such as a dye bomb going off or chaotic stimulus going on around [Nance]" would result in "his judgment [being] further impaired." The record supports the habeas court's finding that counsel repeatedly discussed their strategy for the resentencing trial, taking into account what they did in the original trial. Trial counsel were never asked why they did not present Dr. Hutchinson's testimony at the resentencing trial. We note, however, that trial counsel also elicited testimony at the resentencing trial similar to that elicited at the original trial to support their theory that Nance became panicked as a result of the dye packs' detonation, that he did not intentionally shoot the victim, and that he never intended to harm anyone.

" 'It is well established that the decision as to which defense witnesses to call is a matter of trial strategy and tactics.' " (Citation omitted.) *Hubbard v. State*, 285 Ga. 791, 794 (683 SE2d 602) (2009).

In particular,

> [t]he decision of how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.

*Thomas v. State*, 284 Ga. 647, 650 (3) (b) (670 SE2d 421) (2008). Based on the evidence in the record and the deference owed to trial counsel's strategic decisions, we conclude that the omission of Dr. Hutchinson's testimony at the resentencing trial was the result of a reasonable strategic decision made after a thorough investigation into the dye packs and the possible effects of their detonation on Nance and, thus, that the habeas court erred in finding trial counsel performed deficiently in this area. See *Williams v. Head*, 185 F3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [trial counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").

(ii) *Actual Prejudice*

Moreover, even assuming that trial counsel's strategies fell below professional norms, we conclude as a matter of law that the omission of Dr. Hutchinson's testimony did not prejudice Nance. The habeas court found that, as a result of not presenting Dr. Hutchinson's testimony, trial counsel failed to inform the jury that exposure to the dye packs exacerbated "[Nance's] cognitive limitations and therefore his impulsivity and poor judgment" and, accordingly, "substantially diminished his culpability by reducing the 'volitional nature' of the shooting."

GBI microanalyst Peterson opined at the resentencing trial that "very heavy" stains from the red dye were present on Nance's gloves because they and, impliedly, Nance were "extremely near, if not touching," one of the dye packs when it detonated. Thus, through cross-examination, trial counsel elicited a State expert's opinion that Nance was significantly exposed to the dye packs' components. However, the State's uncontroverted evidence also showed that the dye packs detonated while inside the pillowcases as Nance placed them between the passenger door and the seat upon entering the vehicle, that he never closed the driver's door, and that he immediately abandoned the vehicle. Had Dr. Hutchinson testified at the resentencing trial, the district attorney surely would have elicited on cross-examination the same acknowledgment from him that was

elicited on cross-examination at the habeas evidentiary hearing, namely, that getting away from the tear gas and into the open air would diminish its effects.

Moreover, Dr. Hutchinson's most significant testimony regarding Nance's culpability was his assertion that "[Nance's] statement that he didn't know that he had actually fired the gun is plausible and more likely than not true." However, a review of the record shows that Dr. Hutchinson misconstrued Nance's statement. While the officer who took Nance's post-arrest statement did testify that Nance stated to him "that he could not remember shooting," the officer also testified that Nance stated the following:

> I thought I only shot once. I looked down at the barrel later and I seen that I shot twice. . . . I was on the side. The guy was trying to run me over. I was just going to scare him.

Thus, Nance did not state that he did not know that he had actually fired the gun but rather that he did not recall shooting twice. Moreover, the Gwinnett County police sergeant who negotiated Nance's surrender to police testified that one of the first things that Nance said to him at the Chevron station was to ask if anyone at the liquor store was hurt. When the negotiating officer asked Nance why he asked, Nance stated: "[W]hen I run over across the street to the liquor store, I tried to get a truck [sic]. And this guy started yelling at me, and *I shot at him* a couple of times." (Emphasis supplied.) Thus, even had Dr. Hutchinson testified at the resentencing trial as he did at the habeas evidentiary hearing, there is no reasonable probability that the jury would have found persuasive his testimony regarding the veracity of Nance's alleged statement that he did not know that he actually fired the gun in light of the contradictory testimony of two different law enforcement officers recounting Nance's separate statements.

The habeas court also found that Nance was prejudiced because Dr. Hutchinson's testimony would have rebutted the district attorney's argument that Nance was "a smart bank robber." However, Dr. Hutchinson's opinion testimony that Nance exhibited signs that the exposure to CS tear gas was having a significant impact on him would not have been supported by the evidence that was presented in the resentencing trial. Specifically, Dr. Hutchinson testified that "[Nance's] effects, his confusion, running through the traffic, almost getting run over, the way he behaved over the next 15, 20 minutes were entirely consistent with the effects of a large dose of exposure to CS." However, there was *no* testimony presented in the resentencing trial that

Nance appeared confused and bewildered after the dye packs' detonation.[7] There was *no* evidence presented at either trial that Nance was almost run over while crossing the highway after the dye packs detonated. Furthermore, multiple witnesses who came into contact with Nance shortly after the detonation testified that Nance did not exhibit any of the symptoms associated with exposure to tear gas.

Instead, the evidence showed the following. Nance immediately jumped out of the car into the open air, grabbed the black trash bag containing the gun, and crossed the highway, apparently without incident. Once in the liquor store parking lot, he ran around the front of the victim's car as the victim was backing out of a parking place, yanked the door of the victim's moving car open, argued with the victim, and fired one shot at him, resulting in his death a short time later. Then Nance turned and confronted a nearby witness, demanding, "Give me your keys." When the witness ran around the side of the liquor store, Nance fired a shot, then ran around the other side of the store, confronted the witness at the back of the store, and "squared off" with the witness, pointing the gun at him. When the witness ran, Nance also turned, ran up the hill, successfully crossed the highway again, and arrived at the Chevron station. There he was soon surrounded by law enforcement personnel, including numerous SWAT team members, who all had their weapons aimed at him and were prepared to shoot him. The negotiating officer testified that he explained to Nance that the surrounding officers would shoot him if he moved the gun away from himself or started to point it toward the negotiating officer, that Nance asked him what would happen if he ran toward an officer, and that the negotiating officer told Nance that that was not an option that he wanted to consider. While Nance threatened that there would be "war" if anyone "rush[ed]" him, he never pointed the gun at anyone but himself, thus demonstrating sufficient self-control, good judgment, and awareness of his circumstances to refrain from doing anything to cause the officers to fire at him.

---

[7] While a Lilburn police officer did testify for the defense at the 1997 trial that Nance appeared confused, trial counsel did not present him as a witness at the resentencing trial. A review of his testimony shows that a reasonable lawyer could have decided that his testimony had been impeached at the original trial. The State elicited testimony on cross-examination that the officer had not included any information concerning Nance's "confused" state in his report, that the first time that the officer had relayed that information to anyone was shortly before he testified, that the officer no longer worked for the Lilburn Police Department and had been unable to obtain another job in law enforcement, and that he was upset that another officer had received the Officer of the Year award that he felt he deserved for his part in Nance's apprehension.

In light of the evidence presented at the resentencing trial regarding Nance's actions immediately after the dye packs' detonation and his own statements regarding the shooting, there is no reasonable probability that the jury would have found credible or persuasive Dr. Hutchinson's testimony concerning the effects of the exposure to CS tear gas on Nance, including his opinion testimony that Nance's statement that he did not know that he fired the gun was "more likely than not true." Thus, there is no reasonable probability that the outcome would have been different even had Dr. Hutchinson's testimony been presented at the resentencing trial.

(d) *Collective Assumed Prejudice Regarding the 2002 Resentencing Trial*

In sum, even if counsel had referred to Nance's low average intelligence as "borderline intellectual functioning" and "borderline mental retardation" and had presented evidence of Nance's organic brain damage and the testimony of Dr. Hutchinson in mitigation during Nance's 2002 resentencing trial, we conclude that there is no reasonable probability that the outcome would have been different. See *Schofield v. Holsey*, 281 Ga. at 811-812, n. 1 (holding that the combined effect of trial counsel's deficiencies should be considered).

### III. *Ineffective Assistance of Counsel Claim at the Guilt/Innocence Phase of the 1997 Trial*

Nance contends in his cross-appeal that the habeas court erred in denying his claim that trial counsel were also ineffective in not presenting Dr. Hutchinson's testimony at the guilt/innocence phase of the 1997 trial. However, for the reasons stated above, trial counsel's decision not to present Dr. Hutchinson's testimony at the guilt/innocence phase of the 1997 trial was a reasonable strategic decision made after a thorough investigation.

Furthermore, Nance was not prejudiced by the omission of this testimony. Trial counsel elicited opinion testimony from the State's expert, GBI microanalyst Peterson, that Nance was exposed to the dye packs' components, as trial counsel also later did in the resentencing trial. For the same reasons stated above, there is no reasonable probability that the jury would have found credible Dr. Hutchinson's testimony that, due to that exposure and Nance's mental impairments, Nance's statement that he did not know that he fired the gun was "more likely than not true."

Moreover, Nance was also charged with felony murder with the underlying felony being the attempted armed robbery of Balogh's car. "[T]he jury did not have to find that [Nance] acted with an intent to kill in order to find him guilty of felony murder, as intent to kill . . . is

not an element of the offense of felony murder." *Brockman v. State*, 292 Ga. 707, 730 (16) (739 SE2d 332) (2013). Similar to 2002, the officer who negotiated Nance into surrendering to police testified in the 1997 trial that Nance told him: "I tried to get a car and the man started yelling at me and I shot at him a couple of times, and do you know if he's hurt or if anybody's hurt." In light of Nance's own statement and McNeal's eyewitness testimony that Nance yanked open the door of Balogh's moving car, that he argued with Balogh, that Balogh raised his arm defensively and shouted "no, no, no," and that Nance turned to McNeal immediately after he shot Balogh and demanded McNeal's keys, there is no reasonable probability that the jury would not have again convicted Nance of the attempted armed robbery of Balogh's car and of felony murder. See id. at 728 (15) (stating that a defendant is not entitled to a jury charge on the affirmative defense of accident "unless there was evidence to support a finding that [the defendant acted] without any 'criminal scheme or undertaking, intention, or criminal negligence' ") (quoting OCGA § 16-2-2). Furthermore, even had Nance been convicted only of felony murder and not malice murder, he would have remained eligible for the death penalty. See OCGA § 16-5-1 (c), (d); *Brockman*, 292 Ga. at 731-732 (18), 738-739 (29); *Blankenship v. State*, 258 Ga. 43, 47 (13) (365 SE2d 265) (1988); *Jefferson v. State*, 256 Ga. 821, 829 (A) (353 SE2d 468) (1987). Thus, we conclude that there is no reasonable probability that the outcome would have been different even had trial counsel presented Dr. Hutchinson's testimony in the guilt/innocence phase of the original trial.

*Judgment affirmed in Case No. S13X0202. Judgment reversed in Case No. S13A0201. All the Justices concur.*

DECIDED JUNE 17, 2013.

*Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Sabrina D. Graham, Mitchell P. Watkins, Assistant Attorneys General*, for appellant.
*Brian Kammer, Kirsten A. Salchow*, for appellee.