S13A0132. THE STATE v. WORSLEY.
(745 SE2d 617)

BLACKWELL, Justice.

Appellee Johnnie Worsley was tried by a Muscogee County jury and convicted of the rape and murder of his seventeen-year-old

stepdaughter, Yameika Bell, and the murder of his wife, Flora Worsley. For each murder, Appellee was sentenced to death. Nearly fourteen years later, the trial court granted a new trial to Appellee with respect to his death sentences, finding that he was denied the effective assistance of counsel in the sentencing phase of his 1998 trial. The State appeals, and we reverse and reinstate the sentences of death.[1]

1. Our analysis begins with a summary of the evidence of the crimes of which Appellee was convicted.[2] Viewed in the light most favorable to the verdict, the evidence shows that Appellee and Ms. Worsley were married in 1984, but they separated only four years later, apparently because Appellee was addicted to cocaine. They began to speak again in 1993, although they continued to live apart. Then, in January 1995, Appellee moved into a house in Columbus with Ms. Worsley and Ms. Bell, having assured Ms. Worsley that he no longer was using drugs. Within weeks, however, Ms. Worsley began to have problems with Appellee. She noticed that he was increasingly hostile, and she began to worry that he might be using drugs again. In late February, Ms. Worsley and Appellee argued about his drug use, and when she said that she would leave him if he

---

[1] Ms. Worsley and Ms. Bell were killed on March 7, 1995. Appellee was indicted on July 16, 1996 and charged with two counts of malice murder and one count of rape. The same day, the State gave notice of its intent to seek the death penalty. Appellee entered pleas of guilty but mentally ill as to the murders and a plea of not guilty as to the rape. Voir dire and the selection of a jury commenced on November 9, 1998, the trial began on November 12, and the jury returned its verdict as to guilt on November 14, finding Appellee guilty on all counts. A sentencing trial followed, and also on November 14, the jury returned its verdict as to sentence, recommending a sentence of death for both murders. In its verdict as to sentence, the jury found as aggravating circumstances that the murder of Ms. Worsley was committed during the commission of the murder of Ms. Bell, see OCGA § 17-10-30 (b) (2), that the murder of Ms. Bell was committed during the commission of the murder of Ms. Worsley, see id., and that each murder was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim. See OCGA § 17-10-30 (b) (7). Based on the recommendation of the jury, the trial court sentenced Appellee to death for the murder of Ms. Worsley, death for the murder of Ms. Bell, and imprisonment for life for the rape. See OCGA § 17-10-31 (a) ("Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the accused to death."). On December 15, 1998, the trial court granted an out-of-time appeal to Appellee, and the same day, he filed a motion for new trial, which he later amended on March 8, 2011. The trial court denied the motion as to the guilt phase of the trial, but granted it as to the sentencing phase, all on August 28, 2012. The State timely filed a notice of appeal, and the case was docketed in this Court for the January 2013 term and argued on January 8, 2013.

[2] We do not have occasion in this appeal to pass upon the sufficiency of the evidence, insofar as Appellee has not taken a cross-appeal to challenge his convictions or the denial of his motion for new trial on the grounds that the evidence was insufficient to sustain his convictions and sentences. Nevertheless, we begin with a summary of the evidence because it may inform our consideration of whether Appellee was, as the trial court found, denied the effective assistance of counsel.

used drugs again, he responded that he would kill her if she left him.[3] Ms. Bell also had problems with Appellee. In particular, on the morning of March 6, Ms. Bell discovered that money was missing from her wallet. That evening, Ms. Bell confronted Appellee about the missing money, and although he denied that he had taken it, he gave her some money.

On March 7, family members began to worry about Ms. Worsley and Ms. Bell. Each morning, Ms. Worsley usually called her mother, but that day, her mother did not hear from her. Her mother did hear from Appellee, however, who called and asked for forgiveness "for what I have done." When asked exactly what he had done, Appellee did not respond and instead disconnected the call. The family also learned that Ms. Bell did not report for school on March 7, and she did not pick up her sister after school, as she was expected to do. That evening, the family contacted law enforcement, but responding officers found no signs of foul play around the exterior of the home that Appellee shared with Ms. Worsley and Ms. Bell, and they did not, therefore, enter the home. The officers instead advised the family to make a missing persons report the next day.

On the morning of March 8, a friend of the family entered the home, where he saw a body on the floor of a bedroom. He immediately exited the home, and the family contacted law enforcement again. This time, when officers responded, they entered the home, and they discovered the bodies of Ms. Worsley and Ms. Bell in a bedroom. The officers noticed blood throughout the home — in another bedroom, a hallway, a bathroom, the kitchen, and a porch — and they observed that the bedroom in which the bodies were found was in "extreme disarray" and appeared to have been ransacked. In that bedroom, the officers saw "numerous blood patterns and [spatters] against the walls, by the bed, on the wall, on the floor, next to the bed, on a locker." The body of Ms. Worsley was on the floor of the bedroom, lying in a pool of blood, and partially covered with a quilt or comforter. The body of Ms. Bell was on the bed, underneath a "huge mass of comforters and bedding." Ms. Bell was naked, lying across the bed, with her feet on the floor and her legs spread apart. Her torn panties were found at her feet, and officers observed a white vaginal discharge. Also in the bedroom, officers discovered a butcher knife lying next to Ms. Worsley's body, a baseball bat against the wall, and an emptied purse.

According to the medical examiner, Ms. Bell died as a result of multiple stab and slash wounds. In all, she sustained nine stab

---

[3] Appellee later claimed that he was only joking when he said that he would kill her if she left him.

wounds to her neck, eleven slash wounds to her neck, and nine stab wounds to her chest and upper abdomen. The wounds to her neck severed her trachea, carotid artery, and jugular veins, and based on foam around her neck, the medical examiner opined that Ms. Bell was "clearly alive and breathing" when her neck was stabbed and slashed repeatedly. The wounds to her chest involved injuries to her lungs, diaphragm, and left kidney. Ms. Bell also had defensive wounds on her arms and hands. In addition, the medical examiner found evidence that Ms. Bell had been penetrated vaginally and that her legs had been forced apart.

Ms. Worsley, the medical examiner found, died as a result of a stab wound to her neck and two blunt force impacts to her head. The stab wound was a deep one, and it alone would have caused her death, the medical examiner explained. The blunt force impacts fractured her skull, which was "crushed inward," and injured her brain, and these impacts also would have caused her death, even without the stab wound. The medical examiner opined that the impacts to her head were consistent with "a full force swing with a [baseball bat]." Ms. Worsley also had a scrape on her chin, which indicated that she was struck and fell face-first onto the floor, after which she was moved onto her back.

On the afternoon of March 8, Appellee drove his white Oldsmobile Cutlass to a car dealership in Phenix City, Alabama. At the dealership, he told a salesperson that he was interested in buying a car, and he took a blue Geo Metro for a test drive, having assured the salesperson that he "just wanted to go right down the street" and "would only be gone about five minutes at the most." Appellee, however, never returned the Metro. In the Cutlass that he left behind at the dealership, officers later found a note in his handwriting. The note said:

> May you all forget for what I done. I now must go to hell and pay for what I am, but still love you. Ashley Lashonya,[4] please know you are hurt, love, Don.[5] [sic]

Officers lifted eight latent fingerprints from the note, six of which matched the prints of Appellee. Also in the Cutlass, officers found two ATM receipts, both dated in the early morning hours of March 8.

That evening, Appellee arrived at Mount Zion Baptist Church in Twiggs County, where he met with a deacon and asked to speak with

---

[4] Lashonia Bell is the sister of Ms. Bell and daughter of Ms. Worsley.

[5] Family members sometimes referred to Appellee as "Don."

the pastor. Appellee told the deacon that he was planning to kill himself and that he needed "forgiveness of my sins and for the crime that I have just committed." When asked about the crime, Appellee explained, "I've just killed my wife and daughter." Eventually, Appellee spoke with the pastor and repeated his plea for forgiveness. Appellee then left the church, and a churchgoer called the Twiggs County Sheriff's Office.[6]

A little while later, the Sheriff of Twiggs County saw Appellee driving a small, blue car on Interstate 16. The Sheriff signaled for Appellee to stop, but Appellee instead attempted to flee, driving away as fast as 95 miles per hour. The Sheriff gave chase, and about four miles down the road, Appellee stopped. When Appellee exited his car, he admitted to the Sheriff that he had killed his wife. The Sheriff held Appellee until Columbus investigators arrived, and after they took custody of Appellee, they noted that he had scrapes on the right side of his face, a cut on his right hand, and what appeared to be blood on his shirt.

Appellee subsequently gave a statement to the Columbus investigators. Among other things, Appellee said that, on the evening of March 6, Ms. Worsley went to work a late shift at her place of employment, and he went to bed. Early on the morning of March 7 — around 2:00 a.m., Appellee said — he awoke, grabbed a knife from the kitchen, and went to the bedroom where Ms. Bell was sleeping. He admitted that he then stabbed Ms. Bell, left the house, purchased crack cocaine, and eventually returned to the house to smoke the crack. Around 8:00 a.m., he said, Ms. Worsley returned home from work, and he hit her in the head with a baseball bat and then stabbed her in the neck. Appellee admitted that he covered both bodies with bedding. He also admitted that he subsequently took a car from a dealership because he knew that law enforcement would be looking for his car. About the fact that Ms. Bell had been found naked, Appellee said that he must have ripped her clothes off, and he confessed that "[m]aybe I did go intend to rape her that night. So, maybe I did." He also admitted that Ms. Bell probably tried to fight him off as he attacked her. A video recording of this statement was admitted at trial and played for the jury.

2. Our analysis continues with a summary of the case presented by the defense at trial. Appellee was represented by two lawyers, one of whom had been practicing as a trial lawyer for 15 years, had

---

[6] Later, when Appellee was in jail awaiting trial, he contacted the deacon with whom he had spoken at Mount Zion Baptist Church. Once again, Appellee admitted to the deacon that he had killed his wife and stepdaughter. He added that he "deserved whatever punishment they gave him."

extensive experience in criminal defense, and had previously represented defendants in two other death penalty cases.[7] Because Appellee had admitted before trial — on several occasions, and to several persons — that he killed Ms. Worsley and Ms. Bell, he was not well positioned at trial to dispute the evidence that he killed both women, and he did not. Instead, Appellee pled guilty but mentally ill to the murders, and at trial, his lawyers freely admitted that he killed both women. Appellee did, however, dispute the rape charge, and more important for the purposes of our analysis, he also offered evidence of his impaired mental health.

In the guilt-innocence phase, Dr. Daniel Grant, a board-certified psychologist,[8] testified that Appellee suffered from mental illness, had limited cognitive abilities, had an impaired memory, and had suffered from a number of exposures, injuries, and medical conditions that affected his cognitive and psychological functions. As a basis for his opinions, Dr. Grant explained that he had conducted complete psychological and neuropsychological evaluations of Appellee, he had administered approximately 20 tests to Appellee to measure cognitive ability and psychological health, and he had reviewed a number of records relating to Appellee, including school records, military service records, jail records, and medical records.

About the psychological health of Appellee, Dr. Grant testified that Appellee suffered from dysthymic disorder, a mental illness that Dr. Grant described as depression that persists "for a long period of time."[9] According to Dr. Grant, Appellee had been "depressed for the major part of his life, starting from childhood," and Dr. Grant explained that:

> [Appellee is] from a home that was a dysfunctional home, where his father was a chronic alcoholic and abusive, and abusive towards his mother. His father was abusive towards his mother. He would hit her, slap her around, and on occasion[,] he would run the whole family out of the house with a gun.

---

[7] We know little about the second lawyer because Appellee never called him to testify at the hearing on the motion for new trial.

[8] Dr. Grant was board certified in neuropsychology and forensic psychology. Early on, defense counsel had consulted about mitigation with the experienced death penalty lawyers in the Office of the Multi-County Public Defender, and they recommended Dr. Grant as a witness. Besides offering testimony for Appellee, Dr. Grant also assisted defense counsel before and at trial.

[9] Dr. Grant acknowledged that persons incarcerated and facing criminal charges often suffer from situational depression, but he distinguished situational depression from dysthymic disorder.

Besides the dysthymic disorder, Dr. Grant also noted several references to paranoia in Appellee's records, and he said that Appellee had been prescribed a tranquilizing medication typically employed to treat "people that have delusions or hallucinations."

With respect to cognitive ability and memory, Dr. Grant testified that Appellee had a full-scale IQ score of 78, which put Appellee in the "borderline range," just above the accepted threshold for mental retardation. Dr. Grant noted that Appellee also scored in the "borderline range" on a language test, that his reading skills tested at a fourth-grade level, and that his math skills tested at a seventh-grade level. Dr. Grant pointed to school records consistent with these findings, which showed, he said, that Appellee was a "marginal student," twice had been held back from promotion, might have been socially promoted on occasion, was 19 years of age when he finally completed high school, and would be referred under contemporary educational standards for a special education evaluation. Dr. Grant also pointed to tests administered to Appellee during his military service, on which, Dr. Grant said, Appellee had "low" scores. In addition, Dr. Grant testified that Appellee had a "significantly low score" on memory tests.

Moreover, Dr. Grant opined that his findings about Appellee were indicative of "actual brain damage," and Dr. Grant pointed to a number of exposures, injuries, and medical conditions that might have contributed to such brain damage. Specifically, Dr. Grant noted that Appellee had a history of alcohol and drug abuse, and he noted as well that Appellee had been exposed occupationally to a number of environmental neurotoxins, including pesticides and fertilizers. Dr. Grant also said that Appellee had reported several head injuries, including injuries sustained in "five or six fistfights" that left Appellee "severely stunned." In addition, Dr. Grant observed that Appellee suffered from diabetes and high blood pressure, both of which, if not properly controlled, can lead to problems with circulation of blood to the brain. In conclusion, Dr. Grant opined that Appellee suffered from mental illness, that his mental illness affected his behavior, and that it impaired his judgment.

When the time came for closing arguments in the guilt-innocence phase of the trial, defense counsel argued extensively about the mental health of Appellee and stressed that his culpability was mitigated — but not eliminated — by his cognitive and psychological impairments. Among other things, defense counsel reminded the jury that the State had come forward with no affirmative evidence to refute the testimony of Dr. Grant that Appellee suffered not only from mental illness, but from cognitive impairments as well. And defense counsel urged that these circumstances "limited [the] choices [of

Appellee]," "caused him problems in making those choices," and "would cause him to make the wrong choices."

After the jury found Appellee guilty of both murders and the rape, the sentencing phase of the trial commenced. In the sentencing phase, Appellee offered the testimony of a jailer, who said that Appellee had caused no problems at the jail and, in fact, had been moved to a lower security cell. That was the only mitigating evidence presented in the sentencing phase, but other mitigating evidence, of course, had been presented earlier in the guilt-innocence phase. In the closing arguments of the sentencing phase, defense counsel repeatedly reminded the jury of that other mitigating evidence, including that Appellee had served honorably in the United States Army, that he confessed voluntarily and repeatedly to the murders, that he had accepted responsibility and repeatedly expressed remorse for his crimes, and that he had no extensive criminal history and no history whatsoever of violent crimes. Defense counsel also argued extensively about the mental health of Appellee. For instance, defense counsel argued:

> It's uncontroverted, it's unrefuted that [Appellee] has organic brain damage. And it affects his life. It adversely affects his life. That's undisputed.
>
> . . .
>
> [Appellee] was endowed at birth with a below average intelligence that borders on mental retardation, uncontroverted.
>
> . . .
>
> At a very early age, he exhibited signs of mental [sic] and h[is] emotional disturbance went up untreated. At the time of these crimes that you have found him guilty of, his mental and emotional development was significantly below that of persons of his chronological age, his same age.

Near the end of closing arguments, defense counsel made an appeal to mercy, and to conclude, returned again to the recurring theme of mental illness and cognitive impairment:

> And the question to me is how am I playing the game that I'm in right now? I don't mean to make light of it by calling it a game, I think it's a very serious game. And I'm wondering if the great scorer, what he's going to write against my name. I don't want to have a man with organic brain damage killed[,] and I'm trying to keep him from it. How do we play the game? Do we execute a man who has something wrong

with him? It's unrefuted that something is wrong with him, or do we let him live his life in prison and give him two life sentences without parole, consecutive to each other? That's all you should do.

3. Next, we turn to the settled and familiar principles of law that courts apply when they consider whether a defendant was denied the effective assistance of counsel. To show a denial of effective assistance, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, a defendant must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also *Kimmelman v. Morrison*, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). This is no easy showing. As the United States Supreme Court has explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U. S. at 689-690 (III) (A) (citations omitted). See also *Humphrey v. Nance*, 293 Ga. 189, 191 (II) (A) (744 SE2d 706) (2013). To these ends, the law recognizes a "strong presumption" that counsel performed reasonably, *Strickland*, 466 U. S. at 689 (III) (A), and the defendant bears the burden of overcoming this presumption. See id. To carry that burden, the defendant must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not, see *Nance*, 293 Ga. at 191 (II) (A) (1), or put another way, that his lawyer "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Harrington v. Richter*, 562 U. S. ___ (IV) (131 SCt 770, 178 LE2d 624) (2011) (citation and punctuation omitted). And to carry the burden, the defendant must show these things by competent evidence, for a silent or ambiguous record is not sufficient to overcome the presumption. *Shaw v. State*, 292 Ga. 871, 874 (3), n. 5 (742 SE2d 707) (2013). See also *Chandler v. United States*, 218 F3d 1305, 1314, n. 15 (11th Cir. 2000) (en banc) ("[W]here the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done . . . ." (citation and punctuation omitted)).

Even when a defendant has proved that the performance of his lawyer was deficient in a constitutional sense, he also must prove prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). See also *Williams v. Taylor*, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). The defendant does not have to show that it is "more likely than not" that the result of the proceeding would have been otherwise but for the errors of his lawyer. See *Schofield v. Gulley*, 279 Ga. 413, 416 (I) (A) (614 SE2d 740) (2005). But "[i]t is not enough to show that the errors [of counsel] had some conceivable effect on the outcome of the proceeding." *Richter*, 562 U. S. at ___ (IV) (citation and punctuation omitted). Rather, the defendant must show a "reasonable probability" of a different result, which, the United States Supreme Court has explained, is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). Put another way, to prejudice a defendant, "[the] errors [of counsel] must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U. S. at ___ (IV) (citation and punctuation omitted). To the extent that the performance of counsel was deficient in more than one respect, it is the collective effect of the deficiencies against which prejudice is measured. See *Schofield v. Holsey*, 281 Ga. 809, 812, n. 1 (642 SE2d 56) (2007).

In all, the burden of proving a denial of the effective assistance of counsel is a heavy one. See *Kimmelman*, 477 U. S. at 382 (II) (C). See also *Richter*, 562 U. S. at ___ (IV). Whether the defendant has carried his heavy burden is a question committed in the first instance to the trial court, and even on appeal, we defer to its findings of fact unless clearly erroneous. See *Perkins v. Hall*, 288 Ga. 810, 812 (II) (708 SE2d 335) (2011). We owe no deference, however, to its conclusions of law, and we apply the law ourselves to the material facts of a case. See id. In this case, the trial court concluded that Appellee was denied the effective assistance of counsel in two respects at the sentencing phase of his trial. We will consider each in turn.

4. First, the trial court concluded that Appellee was denied the effective assistance of counsel in the sentencing phase with respect to the presentation of mitigating evidence. At the hearing on the motion for new trial, Appellee called two of his sisters — Shirley Barrett and Frances Worsley — as witnesses. Both said that they would have testified at trial, but they were never asked to do so. They added that several other relatives of Appellee also were willing and available to testify at trial, but these other relatives could not appear at the hearing, either because they had passed away since the trial, or because they were too ill or infirm to travel to Georgia from their homes in North Carolina. After hearing from the sisters, the trial court concluded that trial counsel were ineffective because they failed to present the testimony that the sisters or other family members might have offered at trial.[10]

---

[10] The trial court also concluded that trial counsel were ineffective because they failed to adequately investigate the potential testimony that the sisters and other family members might have offered. The record, however, will not sustain this conclusion. Although there is some dispute about whether trial counsel ever spoke with Shirley Barrett before trial, the evidence is *undisputed* that trial counsel spoke with other family members on several occasions before the trial and discussed, among other things, the family and circumstances in which Appellee was raised. Frances Worsley admitted that she spoke with trial counsel by telephone before the trial, that trial counsel asked her and other family members to come to Columbus for the trial, and that when she came to Columbus, she met with trial counsel. More important, there is *no evidence whatsoever* that trial counsel was unaware of the testimony that the sisters or other family members were prepared to give at trial. At the hearing on the motion for new trial, Appellee only called one of his trial counsel as a witness, so the record is altogether silent about what the other trial counsel knew and did not know. And even as to the trial counsel who did testify at the hearing, Appellee never asked him what he knew, and what he did not know, about the testimony that family members might give. That trial counsel was unable to recall some details of his discussions with the family is unsurprising, considering that the hearing was held more than a decade after the trial, and it is unavailing to Appellee in any event. As noted earlier, a silent or ambiguous record is not sufficient to overcome the presumption of reasonable performance, and it is Appellee's burden to make a complete and clear record. See *Whatley v. Terry*, 284 Ga. 555, 566 (V) (A) (668 SE2d 651) (2008) (holding that even the demise of trial counsel does not relieve a claimant of his burden to prove an ineffective assistance claim); see also *Chandler*, 218 F3d at 1314, n. 15. Where the record is silent or ambiguous, we must presume that counsel did what they should have done and knew what they should have known. See *Shaw*, 292 Ga. at 874, n. 5; see also *Williams v. Head*, 185 F3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [trial counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment."); *Chandler*, 218 F3d at 1314, n. 15. And if trial counsel knew the matters to which the sisters and other family members might have testified, but reasonably determined that such testimony would be more unhelpful than helpful, it cannot be said that trial counsel failed to fulfill their obligation to adequately investigate the potential of such testimony. See *Strickland*, 466 U. S. at 690-691 (III) (A) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). See also *Wiggins v. Smith*, 539 U. S. 510, 521-522 (II) (A) (123 SCt 2527, 156 LE2d 471) (2003). The trial court faulted trial counsel for only communicating with family members before trial by telephone, rather than traveling to North Carolina to visit with them in person,

At the hearing on the motion for new trial, the sisters shared the testimony that they could have offered at trial. Shirley Barrett said that she could have testified about the sharecropper farm on which Appellee was raised, that Appellee worked hard on the farm, that he was a "pretty good" student in school, that he is a "fairly intelligent man," and that he served in the Army. She also identified several photographs of Appellee — as a student and a soldier — that she could have authenticated at trial. And she said that, if asked to testify at trial, she would have asked the jury to spare Appellee's life. Like her sister, Frances Worsley said that she could have testified at trial about the farm on which Appellee was raised, that he worked hard on the farm, and that he served in the Army. Also like her sister, Frances Worsley said that she would have asked the jury to spare Appellee's life. She added, however, that she also could have testified that the family in which Appellee was raised was a close one and that Appellee sent money to his mother while he was in the Army.

No doubt, the testimony that the sisters might have offered at trial had some potentially mitigating value. But counsel is not required to present all mitigating evidence. See *Humphrey v. Nance*, 293 Ga. at 191 (II) (A) (1); see also *Wiggins v. Smith*, 539 U. S. 510, 533 (II) (B) (3) (123 SCt 2527, 156 LE2d 471) (2003) (defense counsel not required "to present mitigating evidence at sentencing in every case"); *Chandler*, 218 F3d at 1319. Here, there were good strategic reasons for a lawyer to decline to present such testimony, notwithstanding that it had some potentially mitigating value. In the first place, some of the testimony contradicted the testimony of Dr. Grant, particularly the testimony of Shirley Barrett that Appellee was a "pretty good" student and a "fairly intelligent man," as well as the testimony of Frances Worsley that Appellee was raised in a close family. Recall that Dr. Grant testified that Appellee was a "marginal student," that he had a "borderline" IQ score, and that he was raised in a "dysfunctional home." A reasonable lawyer might reasonably worry about how the jury would perceive such contradictions, and that is one reason given by trial counsel in this case for why they chose not to call family members to testify for Appellee.

---

but we find no authority for the proposition that a lawyer always must meet with potential mitigation witnesses in person. And in any event, there is no evidence that trial counsel could have learned anything of importance had they visited North Carolina that they could not learn by telephone. We also note that several of the matters to which the sisters might have testified at trial — that Appellee graduated from high school and served honorably in the Army, for instance — certainly were known to trial counsel by the time of trial, inasmuch as Dr. Grant testified about such things.

A reasonable lawyer might also have been reasonably concerned about harmful cross-examination. Trial counsel in this case knew that Appellee had a brother who was serving a prison sentence for murder, a fact that, they believed, the prosecuting attorneys likely would have brought out on cross-examination if any family members testified. As trial counsel acknowledged, they did not "want the jury to believe that [Appellee] came from a family of murderers." The concern about the brother was a reasonable one. See *Chandler*, 218 F3d at 1321 (discussing the relevance of potential cross-examination to an ineffective assistance claim).

In addition, trial counsel assessed that the family members with whom they communicated before trial would not make good witnesses. These family members were unable, according to trial counsel, to give specific answers to questions, instead speaking only in "[v]ery general, nonspecific" terms. As trial counsel put it, "[we] could not get any of them to answer with any specificity about when things might have happened or that sort of thing." Moreover, trial counsel found that the family members contradicted one another,[11] and trial counsel "didn't think they would be able to articulate very well," allowing their testimony to be "twisted and turned by the prosecution." Trial counsel also worried that the family members "had agendas that were not akin to ours" and "might even try and create things just because they felt [trial counsel] wanted to hear them." How a jury might perceive such witnesses is something about which a reasonable lawyer might reasonably worry.

Finally, a reasonable lawyer might reasonably have concluded that the mitigating value of any testimony that family members might give was far less than the potential downside of such testimony. After all, Dr. Grant already could testify — and did testify — to some of the mitigating circumstances about which the sisters might have testified, including Appellee's honorable service in the Army. Moreover, the testimony that the sisters might have offered related principally to events many years before the murders, and their credibility would have been questionable in any event, considering their contradiction of Dr. Grant and their contradiction of one another. In these circumstances, the record does not permit the conclusion that trial counsel performed unreasonably when they failed to call

---

[11] Indeed, at the hearing on the motion for new trial, the sisters contradicted one another about whether Shirley Barrett had, in fact, come to Columbus for the trial. She said not only that she had not come to the trial, but also that defense counsel had failed to even notify her that a trial was taking place. But Frances Worsley testified that she *and* Shirley Barrett had come to Columbus at the request of defense counsel.

the sisters or other family members as witnesses, and the trial court erred in so concluding.[12]

5. The trial court also concluded that Appellee was denied the effective assistance of counsel in the sentencing phase because his trial counsel failed to object to improper victim-impact testimony. In the sentencing phase, the State presented victim-impact testimony from Ms. Worsley's mother and from Ms. Bell's sister. Ms. Worsley's mother said, among other things, that "[Appellee] should receive the maximum sentence for killing my daughter and my granddaughter because [Ms. Worsley] and [Ms. Bell] didn't have any say in the matter." Ms. Bell's sister said that "[Appellee] deserves the ultimate sentence for taking my family away from me forever. . . . Why should he be the luck[y] one?" Trial counsel failed to object to either of these statements.

It is settled law that testimony by relatives of a victim concerning the appropriate sentence is not properly admissible in a death penalty case as victim-impact testimony. *Bryant v. State*, 288 Ga. 876, 895-898 (15) (a) (708 SE2d 362) (2011). See also *Booth v. Maryland,* 482 U. S. 496, 508-509 (II) (B) (107 SCt 2529, 96 LE2d 440) (1987) (overruled on other grounds by *Payne v. Tennessee*, 501 U. S. 808 (111 SCt 2597, 115 LE2d 720) (1991)); *Stinski v. State*, 286 Ga. 839, 854 (55) (691 SE2d 854) (2010). For that reason, we will assume that trial counsel performed unreasonably when they failed to object to these statements. But we cannot conclude that, if a timely objection to these statements had been interposed, a reasonable likelihood exists that the outcome of the sentencing phase would have been different. In the first place, the statements were only implied requests for the jury to recommend the death penalty. Second, the jury likely could have inferred that the testifying witnesses supported the decision of the State to seek the death penalty simply from the fact that the witnesses appeared in the sentencing phase to give victim-impact testimony. See *Butler v. State*, 292 Ga. 400, 407 (3) (a) (738 SE2d 74) (2013). See also *Stinski*, 286 Ga. at 854 (55) (finding "several minor" violations of limits of victim-impact testimony harmless beyond a reasonable doubt where violations merely concerned obviously and indisputably accurate, but nonetheless improper, characterizations

---

[12] The trial court also criticized trial counsel for their failure to speak with any of Appellee's school teachers, but no school teacher testified at the motion for new trial. So, even if the failure to speak with a school teacher was unreasonable, Appellee cannot show *any prejudice whatsoever* as a result of that failure. For that matter, Appellee cannot even show that any school teachers were available and willing to speak with trial counsel. And in any event, we note that trial counsel did obtain Appellee's school records, on which Dr. Grant relied in connection with his testimony.

of the crime). Third, the statements, though improper, did not consist of especially heated rhetoric and do not appear to have been especially inflammatory. See *Stinski*, 286 Ga. at 854 (55) (finding improper characterization of crimes as "brutal" and "horrible act[s]" harmless beyond a reasonable doubt). See also *Lockett v. Trammel*, 711 F3d 1218, 1239 (III) (B) (2) (b) (i) (10th Cir. 2013) (finding improper victim recommendation as to sentence harmless where, among other things, the "request for the death penalty was a single, concise sentence," as distinguished from "extremely emotional pleas for the death penalty" in which family members "implore[ ]" and "beg[ ]" the jury for a death sentence). Fourth, the improper statements were only a small part of victim-impact testimony that was, for the most part, properly admissible. See *Short v. Sirmons*, 472 F3d 1177, 1197 (III) (D) (2) (10th Cir. 2006). Fifth, the case for death was a strong one, considering that the murders of Ms. Worsley and Ms. Bell were particularly brutal, and there was no dispute that Appellee was the person who committed those acts of brutality. Cf. *Lott v. Trammell*, 705 F3d 1167, 1219 (10th Cir. 2013) (brief and not especially inflammatory, but nonetheless improper, sentencing recommendation was harmless given "the overwhelming evidence of [the defendant]'s guilt of the two rapes/murders, as well as his admitted guilt of the two subsequent rapes, and the cruel and brutal nature of the crimes"); *Jackson v. Johnson*, 523 F3d 273, 281 (II) (B) (3) (4th Cir. 2008) (where defendant "confessed to murdering [victim], and the autopsy revealed the brutality of the murder," "the evidence concerning the appropriate sentence . . . was 'not close,' " and there was, therefore, no reasonable probability that objection to arguably improper closing argument would have led to a result other than a death sentence). For all these reasons, we conclude that Appellee has failed to carry his burden to show prejudice as a result of the failure of his trial counsel to object to the improper victim-impact testimony.

*Judgment reversed and case remanded. All the Justices concur, except Hunstein, C. J., who concurs in judgment only as to Division 5.*

DECIDED JULY 1, 2013.

*Julia Fessenden Slater, District Attorney, William D. Kelly, Jr., Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Dana E. Weinberger, Sabrina D. Graham, Assistant Attorneys General*, for appellant.
*William J. Mason*, for appellee.